# Illinois Official Reports

## Appellate Court

---

### *In re Tajannah O.*, 2014 IL App (1st) 133119

---

| | |
|---|---|
| Appellate Court Caption | *In re* TAJANNAH O., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Lishon M., Respondent-Appellant). |
| District & No. | First District, Fourth Division<br>Docket No. 1-13-3119 |
| Filed | April 24, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an appeal from the termination of respondent mother's parental rights where respondent did not challenge the trial court's finding that she was unfit based on her numerous failures to deal with her substance abuse problems, but she did argue that the trial court should have considered other options, such as long-term foster care or guardianship, the appellate court rejected respondent's argument and held that the termination of her parental rights was not contrary to the manifest weight of the evidence and that there was sufficient evidence to support the finding that termination was in her child's best interest. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-JA-1116; the Hon. Maureen Delehanty, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Thomas A. Gibbons, of Kreiter & Gibbons & Associates, and Dean N. Bastounes, both of Chicago, for appellant.

Robert F. Harris, Public Guardian, of Chicago (Kass A. Plain and Christopher Williams, of counsel), for appellee.

Panel

JUSTICE FITZGERALD SMITH delivered the judgment of the court, with opinion.
Presiding Justice Howse and Justice Lavin concurred in the judgment and opinion.

## OPINION

¶ 1    Respondent-appellant Lishon M. (respondent) appeals from the trial court's order in the instant cause terminating her parental rights over Tajannah O., her minor child. She contends that it was not in the minor's best interest to terminate her parental rights where she and the minor have an extraordinary bond, she has daily contact with the minor and no witness testified that this contact was harmful or should be diminished. She asks that we vacate the termination order against her and for any other appropriate relief. For his part, Tajannah's public guardian has filed an appellee's brief in this cause, which the State has adopted. For the following reasons, we affirm the trial court's termination order.

¶ 2                                    BACKGROUND

¶ 3    We note at the outset that respondent does not challenge the trial court's finding of unfitness against her on appeal. Rather, she focuses solely on the circumstances surrounding the court's best interest determination. As such, while we will discuss some aspects of the unfitness hearing that took place, our focus, like hers, will center on the best interest hearing.

¶ 4    Tajannah was born on May 7, 2002, to respondent and MacCaren W.[1] The situation was brought to the attention of the Department of Children and Family Services (DCFS) in December 2008, when Tajannah was six years old. A motion for temporary custody and petition for adjudication of wardship alleged that respondent had two other children in DCFS custody, that one of them was born exposed to illegal drugs, that respondent was a heroin user, and, principally, that she had failed to comply with a safety plan that had been issued to her. Although the trial court placed Tajannah in the temporary custody of DCFS, it entered an order of protective supervision allowing her to remain in respondent's care as long as respondent stayed at an inpatient drug treatment program. However, soon thereafter, it was discovered that

_____

[1]Pursuant to the record, MacCaren W., who was named Tajannah's father via a parentage order issued in 2009, signed a consent for Tajannah to be adopted, thereby terminating his parental rights. He is not a party to this appeal.

the drug treatment program discharged respondent due to noncompliance with its rules. Accordingly, in January 2009, the trial court vacated the order of protection and placed Tajannah in the nonrelative foster home of Janice M.[2]

¶ 5 During the next several months, the cause was revisited by the trial court multiple times, as propelled by various motions and hearings. Respondent sought visitation and a return of custody, submitting evidence that she had completed a drug treatment program, parenting classes and individual therapy. The trial court entered a goal of return home within 12 months. Then, on June 4, 2010, the trial court allowed Tajannah's return to respondent under a second order of protective supervision. However, days later, on June 9, 2010, the public guardian filed an emergency motion to vacate the trial court's order, alleging that, after respondent picked Tajannah up for an overnight visit, she was arrested the next morning for driving under the influence while driving Tajannah to school. Tajannah was returned to foster care with Janice M., and respondent pled guilty to DUI.

¶ 6 Despite this, over the next few months, the trial court retained its goal of return home and, by January 2011, had granted respondent unsupervised visits with Tajannah, as respondent had reengaged in services. In June 2011, the trial court entered a modified dispositional order returning Tajannah to respondent's custody as long as she continued participating in services. However, on June 16, 2011, respondent was arrested for felony possession of heroin and was incarcerated. Tajannah's whereabouts were unknown; she was eventually found by DCFS at the apartment of respondent's friend, where respondent had left her for an overnight visit. Tajannah was again returned to the foster home of Janice M., under DCFS guardianship. Respondent pled guilty and was sentenced to two years in prison. In February 2012, the trial court changed its permanency goal to termination of parental rights.

¶ 7 Accordingly, in June 2012, the State filed a supplemental petition in pursuit of the termination of respondent's parental rights citing, as the grounds for respondent's unfitness, the failure to maintain a reasonable degree of interest, concern or responsibility toward Tajannah (750 ILCS 50/1(D)(b) (West 2012)), depravity (750 ILCS 50/1(D)(i) (West 2012)), and the failure to make reasonable efforts to correct the conditions which were the basis for removal and/or the failure to make reasonable progress toward return within nine months from the adjudication of neglect or within any nine-month period thereafter (750 ILCS 50/1(D)(m) (West 2012)).[3] At the ensuing fitness hearing, the State introduced into evidence respondent's criminal history, which, in addition to the felony drug charges for which she was incarcerated at the time of this hearing, included a 1995 felony conviction from manufacturing/delivery of a look-alike substance, a 1998 felony conviction for retail theft, a 2000 felony conviction for retail theft under the name Lisa H., a 2000 felony conviction for retail theft under the name

---

[2]Originally, the trial court placed Tajannah with her aunt but her aunt stated she could no longer care for Tajannah, as respondent had made several threats to her.

[3]The nine-month period cited was from June 17, 2011 (when respondent was arrested for heroin possession and incarcerated) to March 17, 2012 (while respondent was still in prison).

In addition, we note that the State originally asserted a fourth ground of unfitness, namely, incarceration (750 ILCS 50/1(D)(r) (West 2012)). However, the State later withdrew this ground, as respondent was eventually released from prison in July 2013, during the pendency of this litigation.

Ursula M., a 2002 felony conviction for retail theft, a 2009 felony conviction for retail theft, a 2011 felony conviction for retail theft, and the 2011 conviction for DUI.

¶ 8 Several witnesses testified at the hearing. Briefly, Rachel Hoyt, a supervisor at Lutheran Social Services of Illinois who was in charge of Tajannah's case, testified that after the first failed reunification attempt in July 2010, respondent was determined to need inpatient substance abuse treatment, individual and family therapy and urine drops. She completed these and tested negative for drugs, but when Tajannah was returned to her, respondent left her with friends and was arrested on drug charges. Hoyt acknowledged that respondent visited monthly with Tajannah while in prison, consistently sent her letters and talked to her on the phone. However, respondent was reassessed and was recommended to repeat substance abuse services and therapy, and she never completed these because she was in prison. Similarly, Megan Pool, Tajannah's family caseworker, testified that when Tajannah was returned home to respondent, she (Pool) tried several times to visit them but respondent was always unavailable. Pool then learned that respondent had been incarcerated; she helped locate Tajannah and returned her to foster care. She acknowledged that respondent did complete some services while in prison, but not those recommended in her service plans. She also acknowledged that respondent visited with Tajannah monthly and called her consistently when she could; their contact was always positive. Senior supervisor Molly Kim testified in corroboration of Hoyt and Pool.

¶ 9 For her part, respondent presented several exhibits demonstrating her past service plans and certificates from services she had completed. In addition, respondent testified on her own behalf, stating that she had been dealing with a drug abuse problem for many years. In 2008, when DCFS first took custody of Tajannah, she had relapsed but then entered a drug treatment facility, whereupon Tajannah was allowed to stay with her. However, she relapsed and lost custody of Tajannah. Tajannah was returned to her in June 2010, but she lost custody again when she relapsed and was arrested for DUI while Tajannah was in the car. Tajannah was returned a third time in June 2011, but respondent relapsed again when she dropped her off at a friend's house and was later arrested. Respondent testified that through all this, however, she consistently visited Tajannah, wrote letters to her and spoke to her on the phone. She also participated in services offered in prison. She acknowledged that these failed reunification attempts had a negative impact on Tajannah. Respondent also presented the testimony of Steve R., her boyfriend, who testified that he was an educational consultant and had provided financial and emotional support to respondent. He believed respondent and Tajannah were bonded and had a great relationship. Mark Sanders, a licensed clinical social worker and certified drug counselor, testified that several factors made it likely that respondent would be able to maintain her sobriety and adequately parent Tajannah, although he admitted that, in the past, regaining custody of Tajannah was a relapse trigger for respondent.

¶ 10 At the close of the hearing, the trial court found respondent unfit on all three grounds presented.[4] In its lengthy colloquy, the court recited all the facts presented and acknowledged, several times, all the positive aspects of respondent's cause, including the many services she completed, her consistent contact with Tajannah and the bond they share. In fact, the court acknowledged that "[e]very witness testified to her love and affection and appropriate bond for

_____

[4]For the record, we note that, with respect to ground (b), the court found that respondent had maintained a reasonable degree of interest and concern for Tajannah, but not reasonable responsibility. See 750 ILCS 50/1(D)(b) (West 2012).

- 4 -

her daughter" and commented that it did not "make these decisions lightly," specifically due to these factors. However, the court could not ignore the "pattern of arrests and convictions that have been continuous since 1995" as well as the "pattern of substance abuse" which, together, "interfere[ ] with her ability to parent." The court commented that respondent had "repeatedly failed to apply what has been offered on any consistent basis" and simply could not provide a "safe and stable environment" for Tajannah. Therefore, the court declared respondent unfit.

¶ 11    The cause then proceeded to a best interest hearing to determine whether respondent's parental rights should be terminated. Case supervisor Hoyt testified that Tajannah had been living in the same foster home for the last three years, except for the two brief periods where reunification was unsuccessfully attempted with respondent. The foster home consisted of two parents (Janice M. and her husband), and two foster siblings, a 17-year-old boy who was involved in a private guardianship with the foster parents, and a 12-year-old girl who had been adopted by the foster parents. Hoyt stated that the foster home had been visited monthly by her agency since August 2010, and each time it was found to be safe and appropriate. With respect to Tajannah's relationship with her foster family, Hoyt averred that she relies on her foster parents for help and assistance, and that she sees them as parental figures, seeking comfort from them. Hoyt also described that Tajannah has a good relationship with her foster siblings and that she is especially bonded with her foster sister, as they are close in age. With respect to Tajannah herself, Hoyt testified that she has been doing very well in school and that her foster parents are very involved in her schooling and homework. Tajannah participates in many extracurricular activities, such as swimming and dance, and she has many friends in her neighborhood. The foster parents have also ensured that all of her medical needs have been met. Hoyt opined that, even though Tajannah had spent the first six years of her life with respondent, it was in her best interest to terminate respondent's parental rights. She based this on the length of the cause, the multiple failed reunifications, and Tajannah's need to have a safe, secure and permanent living arrangement.

¶ 12    Janice M. testified that Tajannah has lived in her home for about four years. She views Tajannah as part of her family. Tajannah does very well in school, where she attends with her foster sister; they are in the same grade and Tajannah is very close to her. Tajannah is also close to her foster brother, who helps her with her homework. Tajannah is involved in many extracurricular activities, attends church with the family and has many neighborhood friends. With respect to Tajannah's relationship with respondent, Janice averred that, in June 2010, Tajannah was very happy about the prospect of reunification with her but, after respondent's DUI arrest, Tajannah was very sad at its failure. The same emotions were present during the second reunification attempt; Tajannah was very excited to return home, but then was very upset when respondent was arrested and Tajannah could not live with her. Even though they had a good relationship, it was filled with these ups and downs. Janice M. continued to facilitate their relationship, taking Tajannah to see respondent in jail and allowing respondent to call and text Tajannah whenever she wanted during that time. Following respondent's release, Janice M. allowed Tajannah and respondent to communicate daily and visit each other. Janice M. also allowed Tajannah to see respondent's extended family and participate in their family activities. Janice M. acknowledged that Tajannah would have liked to be with respondent and that they have a bonded relationship, but that Tajannah also expressed that she was "okay" with staying with her foster family and being adopted by them if she and respondent could not be reunited. While Janice M. has a private guardian relationship with her

foster son, she was never presented with that option in Tajannah's case. She further testified that, if respondent's parental rights were terminated, she and her husband would adopt Tajannah, whom they love and have made a part of their family, while still allowing her to maintain her bond with respondent.

¶ 13 Finally, respondent testified on her own behalf. At that time, she had been released from prison and was living with her boyfriend. As part of her parole, she was submitting to urine drops five days a week, and she was involved in anger management and relapse prevention services. Since her release, she had visited with Tajannah once and telephoned her daily. She stated that she loves Tajannah and wants her to return home, and that Tajannah has expressed to her that she wants to be with respondent. Respondent was also allowed to address the court personally, and she spoke at length about her love for Tajannah and the services she completed, she acknowledged her mistakes, and she pleaded for another chance to be with Tajannah.

¶ 14 At the close of the hearing, the court concluded that it was in Tajannah's best interest to terminate respondent's parental rights. The court began its colloquy by commenting on the uniqueness of this cause, wherein the child was clearly loved by all involved. It further noted respondent's progress in services and, significantly, her love for Tajannah, which "touched" the court "very much." However, the court acknowledged that, apart from this, respondent has not "been there" for Tajannah but, rather, has been an "absent" parent due to her "failure to maintain any level of long term sobriety." Again, while it was commendable that respondent had completed so many services, the court observed that she has consistently failed to use the tools these services had taught her when it came to Tajannah's care. The court also found that Tajannah "deserves permanency" which, as exhibited by the two failed reunification attempts that caused Tajannah trauma, respondent could not give her. There simply were "too many ups and downs" in their relationship. Moreover, the court noted that Tajannah was settled and thriving in her foster home, where she was loved, she was part of a family and community, and she had become attached. Thus, the court held that "by a preponderance of the evidence, termination of parental rights is in this child's best interest."

¶ 15                                                    ANALYSIS

¶ 16 On appeal, respondent's sole contention is that it was not in Tajannah's best interest to terminate her parental rights where the parent-child bond was extraordinary, respondent and Tajannah have almost daily contact, and no witnesses testified that their contact was harmful or should be diminished. Highlighting her completed services and her successes in treatment, as well as her maintenance of contact with and love for Tajannah, respondent argues that the trial court "mistakenly believed" the only way to achieve permanency for Tajannah was to terminate her parental rights. She asserts that, instead, in order to achieve the trial court's paramount goal of permanency for Tajannah, a different alternative, such as some type of guardianship or long-term foster care, would have been more appropriate for it to consider. We disagree with respondent's claim.

¶ 17 Before we turn to the merits of this appeal, we would note once more for the record that respondent has affirmatively chosen not to raise any issue related to the trial court's finding of her unfitness or the grounds upon which this finding was made. She makes this clear at the outset of her brief in this cause, stating that she is not challenging the unfitness ruling but is directing her appeal only to the trial court's findings regarding Tajannah's best interest and the termination of her parental rights. Thus, we will not review the unfitness finding in this cause

- 6 -

but, instead, examine only the best interest portion of the trial court's decision, according to respondent's contention. See Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013) (points not argued on appeal are waived).

¶ 18 Once a trial court finds a parent unfit pursuant to any one of the grounds of section 1(D) of the Illinois Adoption Act (750 ILCS 50/1(D) (West 2012)), the minor's cause proceeds to a hearing where the court is to determine whether it is in the best interest of the minor to terminate the parent's parental rights under the Juvenile Court Act of 1987 (705 ILCS 405/1-3 (West 2012)). See *In re Jaron Z.*, 348 Ill. App. 3d 239, 261 (2004). In this phase, the burden is upon the State to show that termination is proper based on a preponderance of the evidence. See *Jaron Z.*, 348 Ill. App. 3d at 261. Regardless, in all guardianship cases, " 'the issue that singly must be decided is the best interest of the child.' " *In re Austin W.*, 214 Ill. 2d 31, 49 (2005) (quoting *In re Ashley K.*, 212 Ill. App. 3d 849, 879 (1991) (this "is not part of an equation" but, rather, the main factor that "must remain inviolate and impregnable from all other factors")); see also *In re Violetta B.*, 210 Ill. App. 3d 521, 533 (1991). A child's best interest takes precedence over any other consideration, including the natural parent's right to custody. See *In re S.J.*, 364 Ill. App. 3d 432, 442 (2006) (the superior right of a parent to custody of his minor child is not absolute and must always yield to the minor's best interest); *In re J.L.*, 308 Ill. App. 3d 859, 864-65 (1999). Accordingly, it is not even necessary for a court to first find the minor's parents unfit or that they forfeited their custodial rights if a best interest determination shows that the minor should be placed with someone other than her parents. See *S.J.*, 364 Ill. App. 3d at 442; accord *In re M.M.*, 337 Ill. App. 3d 764, 779 (2003); *Violetta B.*, 210 Ill. App. 3d at 533.

¶ 19 In assessing a minor's best interest, the trial court is to look to all matters bearing on her welfare. See *Violetta B.*, 210 Ill. App. 3d at 534. These include several factors delineated in the Juvenile Court Act itself which take into consideration the minor's age and developmental needs, including:

"(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;

(b) the development of the child's identity;

(c) the child's background and ties, including familial, cultural, and religious;

(d) the child's sense of attachments, including:

(i) where the child actually feels love, attachment, and a sense of being valued ***;

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child." 705 ILCS 405/1-3(4.05) (West 2012).

See also *Austin W.*, 214 Ill. 2d at 49-50; *In re Desiree O.*, 381 Ill. App. 3d 854, 865-66 (2008). Additionally, the court may consider the nature and length of the child's relationship with her present caretaker and the effect that a change in placement would have upon her emotional and psychological well-being. See *Austin W.*, 214 Ill. 2d at 50; *Desiree O.*, 381 Ill. App. 3d at 865-66; accord *J.L.*, 308 Ill. App. 3d at 865. The court's best interest determination not need contain an explicit reference to each of these factors, and a reviewing court need not rely on any basis used by the trial court below in affirming its decision. See *In re Deandre D.*, 405 Ill. App. 3d 945, 955 (2010); accord *In re Tiffany M.*, 353 Ill. App. 3d 883, 893 (2004); *Jaron Z.*, 348 Ill. App. 3d at 263.

¶ 20    Ultimately, the trial court's final determination regarding a minor's permanency lies within its sound discretion and that decision will not be overturned unless it is against the manifest weight of the evidence. See *Jaron Z.*, 348 Ill. App. 3d at 261-62. The court's decision is against the manifest weight of the evidence only when the opposite conclusion is clearly apparent (see *In re Faith B.*, 359 Ill. App. 3d 571, 573 (2005)), and it abuses its discretion only when it acts arbitrarily without conscientious judgment (see *Connor v. Velinda C.*, 356 Ill. App. 3d 315, 324 (2005)). There is a "strong and compelling presumption in favor of the result reached by the trial court" in child custody cases. *Connor*, 356 Ill. App. 3d at 323.

¶ 21    Pursuant to our thorough examination of the record in the instant cause, we cannot conclude that the trial court's decision here to terminate respondent's parental rights to Tajannah is against the manifest weight of the evidence. To the contrary, we agree with the trial court that the evidence clearly shows that it is in Tajannah's best interest to allow her to be adopted by her foster parents.

¶ 22    First, we do wish to commend the progress respondent has made in this cause, as well as the effort she has exerted in completing services and the bond she has conscientiously and consistently maintained with Tajannah during the last several years. Respondent has been a heroin addict for a long time and, even though she has faltered, she has repeatedly attempted to overcome her illness rather than pursuing the easy avenue of giving up, all in an effort to stay clean and sober. She has completed numerous services, including individual and family therapy, treatment for her drug addiction, anger management, parenting classes, stress management, relapse prevention, daily urine drops, etc. And, she completed many of these more than once and/or of her own volition. When it came to a few services ordered of her that she did not timely complete, she made clear that the reason for this was not because she did not want to or did not attempt to but, rather, only because they were not offered at the facility where she was incarcerated at the time. Furthermore, it is wholly undeniable that she loves Tajannah and has done everything she can to maintain a real and viable connection with her. The record is overtly clear with respect to respondent's attempts in this regard. Every single witness who testified, from case supervisors and workers to Tajannah's foster mother, along with the trial court itself, acknowledged respondent's love and affection for Tajannah, and Tajannah's reciprocal love and affection for respondent, as well as the bond they share which, by all accounts, is both strong and appropriate. It cannot be said that respondent has not taken the situation she faces seriously.

¶ 23    However, the bulk of the evidence overwhelmingly supports the trial court's decision here. It has now been five years since Tajannah's removal from respondent's custody, and she is no

- 8 -

longer a young child. During this entire time, save for two very brief reunification attempts, she has lived in only one foster home–that of Janice M. This home, which has been evaluated on a monthly basis for several years, has always been found to be safe and appropriate. Tajannah's needs are being met here, she is thriving, and she is loved. She is bonded to both her foster parents, from whom she seeks comfort and security, and to her foster siblings, particularly her foster sister, who is the same age as her and attends the same grade in the same school. She is doing very well in school, she is involved in numerous church and extracurricular activities and she has many neighborhood friends. Moreover, there was much evidence to the effect that Tajannah's contact with and connection to respondent has been and will continue to be promoted and nurtured by her foster family. Janice M. specifically testified with respect to the myriad times she has allowed Tajannah to talk and visit with respondent whenever the two have wanted. Janice M. even brought Tajannah to visit with respondent while respondent was incarcerated, and she has facilitated Tajannah's connection with respondent's extended family, allowing her to participate in activities with them. And, Janice M. stated that, while Tajannah would love to be with respondent, she has expressed that she is "okay" with continuing to live with and be adopted by her foster family if this cannot be achieved.

¶ 24    In addition, case supervisor Hoyt testified in favor of Tajannah's adoption by her foster family. Despite the fact that Tajannah had spent the first six years of her life with respondent and that a bond between them has been maintained, Hoyt noted that several years had passed during which time Tajannah was not in respondent's care due to respondent's drug use. There had been more than one failed attempt at reunification which affected Tajannah deeply, as well as missed or incomplete services. Further, she believed that what Tajannah needed most was to have a safe, secure and permanent living arrangement just like the one she had while living with Janice M. for the last several years. Thus, it was Hoyt's opinion that it was in Tajannah's best interest to terminate respondent's parental rights.

¶ 25    Most importantly, we cannot ignore the fact that, although respondent has made great strides in becoming a viable parent once again, this was not always the case. Rather, there has been a prevalent and tumultuous theme here of, to put it mildly, ups and downs with respect to respondent and Tajannah's arrangement. The situation with Tajannah came to the attention of authorities precisely because of respondent's drug use, which has never really been removed from the forefront of her life. When authorities first became involved, the court actually allowed Tajannah to remain in respondent's care under an order of protective supervision. The only condition respondent was required to meet was to stay in an inpatient drug treatment program. However, respondent did not do so; she was discharged from the program because she refused to follow its rules. Tajannah was then removed from her care and placed with Janice M.

¶ 26    Yet, respondent was given another chance. Retaining a goal of return home, the trial court allowed Tajannah to return to respondent's care under a second order of protective supervision. However, soon after respondent picked Tajannah up pursuant to this order, she was arrested for DUI with Tajannah in the car while she was driving Tajannah to school. Respondent pled guilty and Tajannah went back to live with Janice M.

¶ 27    Despite this, the trial court once again retained its goal of return home and entered a modified dispositional order returning Tajannah to respondent's care as long as she continued participating in services. However, once again, respondent failed to take advantage of this

opportunity. Only days after Tajannah was returned to respondent, respondent left Tajannah at a friend's apartment and disappeared, having been arrested for felony possession of heroin and incarcerated. No one knew where Tajannah was, and she was found only after DCFS was able to locate her. Once again, Tajannah was returned to the foster home of Janice M. and respondent pled guilty, this time receiving a two-year prison sentence. It was finally at this point that the trial court changed its permanency goal to termination of parental rights.

¶ 28 Based on this history, as well as her age and the stage she is at in her life, permanency is the main key for Tajannah. Respondent simply cannot meet this necessity. She is a long-term heroin addict who has not maintained any long-term sobriety. While she has stayed in Tajannah's life, this has caused her to be an absent parent who has not been able to provide her daughter with any real sense of trust or security. Significantly, although she has completed many services, and some of them more than once, it is quite apparent that she has not been able to truly and successfully implement the tools these services were meant to instill in her to become a viable parent. There have already been two failed reunification attempts, both of which occurred literally within days of Tajannah's return home to respondent. And, respondent's own addiction specialist, who testified on her behalf, explicitly stated that Tajannah's returns have been the catalysts for her relapses. From all this, it is clear that the patterns in respondent's life speak volumes. Her arrests and convictions–nine convictions since 1995, eight of which were felonies and multiple ones occurring within only the last few years–coupled with her substance abuse and relapses have severely interfered with her ability to parent Tajannah, and these ups and downs have already made their traumatic mark on Tajannah herself.

¶ 29 We agree with respondent in one fundamental respect: this is not a typical case. Instead, it is a difficult one because of the bond between respondent and Tajannah. It is not often that this court is presented with a biological parent that has tried so hard, and has succeeded in so many respects, to better herself. However, this case is not difficult when the objective reality of the situation is considered, which is the only basis upon which a ruling is to be made. Respondent is essentially asking for a second chance. Yet, the record is clear that she has already had more than one second chance and that all of these resulted in failure. Based on this record before us, which we have thoroughly reviewed, we find no reason to circumvent the overwhelming evidence supporting the decision to terminate her parental rights in an effort to reward her at the cost of Tajannah's imperative need for permanency and stability.

¶ 30 We wish to address one last assertion for the record here. As a subargument of her main contention on appeal that her parental rights should not have been terminated, respondent asserts that the trial court mistakenly believed this was the only option available for Tajannah. She claims that the trial court should have considered, instead, some other custody alternative short of termination, such as long-term foster care or guardianship, similar to the arrangement Janice M. stated she has with her 17-year-old foster son. We reject such an assertion.

¶ 31 First, it is of no moment what type of custodial relationship Tajannah's foster mother has with a different foster child in her care. This is wholly irrelevant. What was recommended in his case, based on the facts and circumstances of his relationship with his biological parents and his relationship with Janice M., has no bearing on Tajannah or the type of custodial status that is determined to be in her best interest. As we noted early on herein, in assessing a minor's best interest, the trial court is to look to all matters bearing on her welfare, including several factors delineated in the Juvenile Court Act, such as her age, physical safety, sense of

attachment, background, wishes and need for permanency. See *Violetta B.*, 210 Ill. App. 3d at 534; 705 ILCS 405/1-3(4.05) (West 2010). These considerations make every wardship case *sui generis*, and it must be decided solely on its own particular facts. See *In re J.S.*, 2012 IL App (1st) 120615, ¶ 32; see also *In re G.L.*, 329 Ill. App. 3d 18, 26 (2002) (identical wardship dispositions are not required even among siblings in termination cases, since each child's best interests are to be examined independently and in line with the child's own unique needs).

¶ 32    In addition, and more importantly, we find that the manifest weight of the evidence as presented in the record herein supports the trial court's determination that termination of respondent's parental rights, rather than any other type of custodial relationship, was in Tajannah's best interest. Interestingly, respondent has never challenged the trial court's consideration of the statutory factors of the Juvenile Court Act involved in Tajannah's best interest determination, *i.e.*, that it failed to adequately weigh certain ones or that it did not consider others at all. And, even if she had, again, not only was the trial court not required to explicitly reference each factor, but it was clear in the present case from its colloquy that it did, indeed, consider each and every one. See *Deandre D.*, 405 Ill. App. 3d at 955; accord *Tiffany M.*, 353 Ill. App. 3d at 893; *Jaron Z.*, 348 Ill. App. 3d at 263.

¶ 33    Furthermore, respondent's assertion misses the mark, especially with respect to the particular circumstances of Tajannah's case. She is correct that there are several other options a court may consider when it comes to a minor's permanency, ranging from reunification with the parent, to some sort of transfer of guardianship or wardship to another person, to adoption. See 705 ILCS 405/1-1 *et seq.* (West 2012). For example, and as respondent highlights, sections 2-27(1)(a-5) and 2-28(2) of the Juvenile Court Act allow the permanent transfer of guardianship of a minor to a third party when other options for the minor's custody are not available. See 705 ILCS 405/2-27(1)(a-5), 2-28(2) (West 2012); see *In re Robert H.*, 353 Ill. App. 3d 316, 319-20 (2004). However, the opportunity for this is strictly limited. The Juvenile Court Act makes clear that alternative placement options such as private guardianship of a minor are only available "for children for whom the permanency goals of return home and adoption have been ruled out." 705 ILCS 405/2-27(1)(a-5) (West 2012). Accordingly, the permanency goals of return home and adoption are "statutorily preferred" over private guardianship and, in order for such an alternative to be available, a trial court must first simultaneously exclude both the minor's return home and, at the same time, the termination of the parents' rights. *In re Jeffrey S.*, 329 Ill. App. 3d 1096, 1103 (2002); accord *Robert H.*, 353 Ill. App. 3d at 320-21 (guardianship alternative is available only when trial court first determines that minor should not be returned home but at the same time that the parents' rights should not be terminated and adoption should not take place); see also *In re E.B.*, 231 Ill. 2d 459, 463-64 (2008) (scope of trial court's authority to terminate parent's rights is strictly limited by Juvenile Court Act and it cannot operate outside of it or else its rulings are void). And, just as with any determination involving a minor's best interest, setting a permanency goal, including one for guardianship, is within the broad discretion of the trial court, and its decision will not be disturbed unless it is contrary to the manifest weight of the evidence, which occurs only where the opposite conclusion is clearly apparent. See *Faith B.*, 359 Ill. App. 3d at 572-73; see also *M.M.*, 337 Ill. App. 3d at 779.

¶ 34    In the instant cause, the trial court could not have awarded an alternative guardianship arrangement to respondent under the circumstances. While return home was ruled out during the analysis of Tajannah's best interest, adoption by Janice M. was not, based on Tajannah's

need for permanency and stability. In fact, the trial court found that adoption was in Tajannah's best interest. Accordingly, and in direct contradiction to respondent's assertions here, the trial court in no way "mistakenly" failed to consider any alternative custodial relationship based on the evidence presented. Rather, only if the court had first determined that it was not in Tajannah's best interest to terminate respondent's parental rights, which, again, it did not, would the court even have been able to then consider the option of a custodial alternative. See, *e.g.*, *E.B.*, 231 Ill. 2d at 463-64; *Jeffrey S.*, 329 Ill. App. 3d at 1103 (trial court did not err in failing to order private or subsidized guardianship where both return home to biological father and adoption by foster mother could not be ruled out under section 2-27(1)(a-5)).

¶ 35 Ultimately, the record here establishes that the trial court's decision to terminate respondent's parental rights was not contrary to the manifest weight of the evidence. Instead, from all that was presented, we find ample evidence to support its finding that this was in Tajannah's best interest. Accordingly, we find no error on the part of the trial court.

¶ 36                                                     CONCLUSION

¶ 37 For all the foregoing reasons, we affirm the judgment of the trial court.

¶ 38 Affirmed.