NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 230488-U

NO. 4-23-0488

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 6, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* S.F., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Winnebago County |
| Petitioner-Appellee, | ) | No. 21JA39 |
| v. | ) | |
| Misty F., | ) | Honorable |
| Respondent-Appellant). | ) | Francis M. Martinez, |
| | ) | Judge Presiding. |

---

JUSTICE LANNERD delivered the judgment of the court.
Presiding Justice DeArmond and Justice Steigmann concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's finding that termination of respondent's parental rights was in S.F.'s best interest was not against the manifest weight of the evidence.

¶ 2    On February 23, 2023, the State filed a petition to terminate the parental rights of respondent, Misty F., and Michael F., as to their child, S.F. (born February 1, 2011). On May 17, 2023, Michael F. signed a final and irrevocable consent to the adoption of S.F. by his grandparents, with whom S.F. had been living since February 2021. That same day, the trial court entered an order finding termination of respondent's parental rights was in S.F.'s best interest. Michael F.is not a party to this appeal. Respondent appeals, arguing the State failed to prove by a preponderance of the evidence that it was in S.F.'s best interest to terminate her parental rights. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4    On February 9, 2021, the State filed a petition alleging S.F. was a neglected minor

under section 2-3 of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3 (West 2020)). According to the petition, S.F.'s environment was injurious to his welfare, placing him at risk of harm for two reasons. First, respondent had mental health issues preventing her from properly parenting him. Second, respondent and Michael F. had a history of domestic violence.

¶ 5     At an adjudicatory hearing on May 5, 2021, respondent stipulated she had a mental health issue that prevented her from properly parenting S.F. That same day, the trial court entered an adjudicatory order, finding S.F. was a neglected minor. Then, on July 2, 2021, the court entered a dispositional order making S.F. a ward of the court, finding (1) respondent and Michael F. were unfit or unable for some reason other than financial circumstances alone to care for, protect, train, or discipline S.F. and (2) that it was in S.F.'s best interest to remove him from the custody of his parents.

¶ 6     On February 23, 2023, the State filed a petition to terminate the parents' parental rights. Because Michael F. is not a party to this appeal, we only address the counts and evidence presented against respondent. The petition alleged she failed (1) to make reasonable efforts to correct the conditions that were the basis for S.F.'s removal during the nine-month period between May 4, 2022, to February 4, 2023 (count I); (2) to make reasonable progress toward the return of S.F. to her during the nine-month periods between December 17, 2021, to September 17, 2022, and/or April 11, 2022, to January 11, 2023 (count II); and (3) to protect S.F. from conditions within the environment injurious to his welfare. The State also alleged respondent had been addicted to non-prescription drugs for at least one year prior to the commencement of the unfitness proceeding.

¶ 7     On April 3, 2023, the trial court held a hearing on the State's petition to terminate respondent's parental rights. Respondent failed to appear. Lacey Wacker-Gray, a foster care caseworker at Youth Service Bureau (YSB) assigned to this case in April 2021, testified

respondent's service plan required her to cooperate with the Illinois Department of Children and Family Services (DCFS); maintain her psychiatric treatment, medication, and counseling; remain sober; and refrain from any relationship involving domestic violence. Respondent was told the importance and need for her to complete recommended services.

¶ 8        Wacker-Gray testified respondent failed to stay in regular contact with her. Wacker-Gray estimated respondent replied to approximately 25% of Wacker-Gray's phone calls, text messages, and home visits.

¶ 9        As for respondent's mental health issues, Wacker-Gray testified YSB had concerns because of her reported delusions. Respondent was in mental health treatment at the L.P. Johnson Center at the University of Illinois at Chicago. Her treatment included medication management, psychiatric care, and counseling. Respondent failed to consistently engage in counseling but did participate in the medication aspect of treatment. However, she failed to complete her mental health services.

¶ 10        Turning to respondent's issues regarding domestic violence, Wacker-Gray testified YSB continued to have concerns because respondent was still living with Michael F. despite their history of domestic violence. According to Wacker-Gray, respondent was not referred to domestic violence services because she was not mentally stable enough to benefit from those services.

¶ 11        As for respondent's substance abuse issues, Wacker-Gray testified respondent was reportedly using methamphetamine and heroin and missed approximately 75% of her drug drops. Respondent was also asked to complete a substance abuse assessment but failed to do so.

¶ 12        Regarding respondent's parenting, Wacker-Gray testified she struggled to interact with S.F. during supervised visits. Instead, she had S.F. watch television or play video games. Any interaction she had with S.F. was limited. Respondent did have periods where she would

consistently visit with S.F. However, at other times, she failed to confirm visits or would not open the door for visits. Wacker-Gray estimated respondent missed approximately 50% of her available supervised visits with S.F. Respondent was not allowed unsupervised visits with the child. Wacker-Gray testified respondent could not be referred to parenting classes at that time because she had failed to maintain her sobriety.

¶ 13 According to Wacker-Gray, respondent still needed to complete substance abuse services, complete parenting and family counseling when clinically appropriate, and maintain her mental health services. Further, YSB continued to have concerns about respondent's ability to safely parent S.F. because she was not participating in drug drops to prove she was maintaining her sobriety or consistently participating in counseling. In addition, respondent was still in a relationship with Michael F.

¶ 14 On April 19, 2023, the trial court found the State proved respondent was unfit because she (1) failed to make reasonable efforts to correct the conditions that were the basis for S.F.'s removal in the nine-month period between May 4, 2022, and February 4, 2023 (750 ILCS 50/1(D)(m)(i) (West 2022)) (count I); (2) failed to make reasonable progress toward the return of S.F. during the nine month periods between December 17, 2021, to September 17, 2022, and April 11, 2022, to January 11, 2023 (*id.* § 1(D)(m)(ii)) (count II); and (3) failed to protect S.F. from conditions within the environment injurious to his welfare (*id.* § 1(D)(g)) (count III). The court also found the State proved Michael F. was unfit.

¶ 15 The case then proceeded to the best interests portion of the termination proceedings. The State asked the trial court to take judicial notice of the unfitness proceeding, which the court indicated it would do.

¶ 16 Once again, at the best interests hearing, Wacker-Gray was the State's only witness.

She testified S.F.'s physical needs, including his food, shelter, health, and clothing, were being met by his paternal grandparents. The grandparents had acted as S.F.'s foster parents since February 2021. S.F. was developing a sense of identity in the foster home and was involved in wrestling, football, and tutoring groups. S.F. also had extended family support in the foster placement, went on vacations with his family, and spent time with his older brother. While S.F. was very attached to his dogs, which lived with respondent, he was also attached to his grandmother. Wacker-Gray testified S.F. felt valued by his grandparents and secure living with them. He received continuity of affection and stability in the grandparents' home and had his own bedroom, which he was able to personalize. Only S.F. and his grandparents lived in the home. S.F. had many friends in his grandparents' neighborhood, at school, and in his wrestling club.

¶ 17 According to Wacker-Gray's testimony, S.F. wanted to stay with his grandparents but also wanted the opportunity to see respondent and Michael F., who he recognized as his mother and father, and his dogs. S.F. still had a relationship with both of his parents. S.F.'s grandmother had taken S.F. to respondent's home for supervised visits and to see the dogs. While living with his grandparents, S.F. initially had some behavioral difficulties, including displaying anger toward his parents, not wanting to do his schoolwork, and similar problems. However, after more time living with his grandparents, S.F. had become more focused, was doing better in school, was participating in wrestling and football, and was controlling his temper.

¶ 18 Wacker-Gray testified YSB's assessment was S.F.'s best interests would be served by terminating his mother and father's respective parental rights so that his grandparents could adopt him. Wacker-Gray stated S.F. needed a caregiver who was stable and could properly supervise and support him. The caseworker testified the best environment for S.F. would be with his foster parents.

¶ 19    On cross-examination by respondent's attorney, Wacker-Gray testified respondent had attended some of S.F.'s wrestling tournaments during the prior fall and winter, which pleased S.F. Wacker-Gray also indicated S.F. talked to his mother on the phone and still wanted to be around his mother and father. Further, respondent had come to S.F.'s birthday party and visited him on Christmas. Wacker-Gray was not aware of these visits having any adverse effect on S.F. During visits she supervised between S.F. and respondent, the caseworker noted S.F. was focused on the dogs and did not talk much with respondent. Wacker-Gray acknowledged respondent had encouraged S.F. to participate in athletic activities and to do his schoolwork.

¶ 20    Upon questioning by S.F.'s guardian *ad litem* (GAL), Wacker-Gray testified S.F.'s foster grandmother had been working for S.F.'s benefit by participating in services, engaging in counseling, and working directly with S.F.'s school. S.F.'s grandmother paid for his sports and took him to practices. According to Wacker-Gray, this was the second time S.F. had lived with his grandparents because of DCFS's involvement in his life. The caseworker indicated S.F. initially had issues with his mother and father not responding to calls or texts from him. However, S.F. had reached a point where this no longer bothered him.

¶ 21    At the end of the hearing, the trial court again indicated it would take judicial notice of the unfitness portion of the proceeding in making its best interests determination. Respondent chose not to testify at the best interests hearing.

¶ 22    S.F.'s GAL made a proffer to the trial court that he visited S.F. four times in the foster grandparents' home while this case was pending. The GAL indicated the foster grandparents were attentive to S.F.'s needs. The foster grandmother started working or volunteering at S.F.'s school so she would be there to deal with any problems he might be having. The GAL stated she was impressed by S.F.'s growth in the foster placement. Further, the GAL recommended the court

find S.F.'s best interest would be served by terminating his mother and father's respective parental rights to free S.F. for adoption by his grandparents.

¶ 23    At a hearing on May 17, 2023, where the trial court announced its best interests determination, respondent again failed to appear. Michael F. signed a final and irrevocable consent to the adoption of S.F. by the boy's paternal grandparents. The court also found it was in S.F.'s best interest to terminate respondent's parental rights, stating:

> "The respondent parents have been found unfit by clear and convincing evidence, and the evidence presented to support these findings supports the finding that the prospects of the parents, in this case it's Misty [F.] that we are focusing on, the prospect of attaining fitness within a reasonable time is slim.
>
> The testimony by Miss Wacker-Gray establishes that [S.F.] has been fully integrated into the foster family. He has formed an attachment with extended family. He is thriving physically and emotionally, and [he] is in a stable environment that provides—he's in a stable environment that allows him to thrive. The overriding need for permanency is satisfied by termination and adoption."

¶ 24    This appeal followed.

¶ 25                                   II. ANALYSIS

¶ 26    On appeal, respondent does not challenge the trial court's unfitness findings. Instead, she only argues the court erred in determining it was in S.F.'s best interest to terminate her parental rights. According to respondent, the State presented insufficient evidence to meet its burden of proof.

¶ 27    Under section 2-29(2) of the Act (705 ILCS 405/2-29(2) (West 2022)), the involuntary termination of parental rights involves a two-step process. First, the State must prove

by clear and convincing evidence the parent is "unfit," as that term is defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022)). *In re Donald A.G.*, 221 Ill. 2d 234, 244 (2006). If a parent is determined to be unfit, the trial court next looks to whether termination of the parent's parental rights is in the best interest of his or her child. *In re D.T.*, 212 Ill. 2d 347, 352 (2004).

¶ 28 "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *Id*. at 364. The State must prove termination is in the minor's best interest by a preponderance of the evidence. *Id*. at 366. In making this determination, the court must consider the factors found in section 1-3(4.05) of the Act (705 ILCS 405/1-3(4.05) (West 2022)). These factors include:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties, including familial, cultural, and religious; (4) the child's sense of attachments, including love, security, familiarity, and continuity of affection, and the least-disruptive placement alternative; (5) the child's wishes; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parental figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the persons available to care for the child." *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009) (citing 705 ILCS 405/1-3(4.05) (West 2008)).

However, the court is not required to refer to each of the best interest factors. *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19. Further, this court need not rely on the basis set forth by the trial court to affirm its decision. *Id.*

¶ 29 A reviewing court will not disturb a trial court's best interests determination unless

the trial court's finding was against the manifest weight of the evidence. *Jay. H.*, 395 Ill. App. 3d at 1071. "A decision is against the manifest weight of the evidence only if the facts clearly demonstrate that the court should have reached the opposite result." *Id.*

¶ 30        The focus of respondent's argument is that the best interest report was not entered into evidence. As a result, according to respondent, the State's only evidence was the testimony of caseworker Wacker-Gray at the best interest hearing. In addition, respondent contends the State failed to lay a proper foundation for Wacker-Gray's testimony at the best interest hearing. According to respondent, the State failed to establish the source of Wacker-Gray's testimony or identify whether she was testifying based on her personal knowledge, her opinion, or hearsay information.

¶ 31        We note Wacker-Gray's testimony at the best interest hearing was not the only evidence the State asked the trial court to consider in determining whether termination of respondent's parental rights was in S.F.'s best interest. Without objection, the State asked the court to take notice of the unfitness proceeding. The court indicated it would do so. As for respondent's argument the State failed to lay a proper foundation for the different parts of Wacker-Gray's testimony at the best interest hearing, respondent failed to preserve this argument because she did not make a specific and timely objection during Wacker-Gray's testimony. See *In re Estate of Doyle*, 362 Ill. App. 3d 293, 303 (2005).

¶ 32        We find no merit in respondent's argument the State failed to meet its burden of proving by a preponderance of the evidence that termination was in S.F.'s best interest. In making its best interests determination, the trial court indicated the evidence presented at the unfitness portion of the termination proceeding—of which the court indicated it was taking judicial notice without objection by respondent—showed the prospect of respondent attaining fitness within a

reasonable amount of time was not good. In addition, the court stated the evidence presented at the best interests hearing showed S.F. was fully integrated into the foster home with his paternal grandparents, had formed attachments with his extended family, and was thriving emotionally and physically in the stable environment provided by his grandparents. Finally, the court indicated S.F.'s "overriding need for permanency" would be served by the termination of respondent's parental rights.

¶ 33        The evidence in this case supported the trial court's ruling. Wacker-Gray testified terminating respondent's parental rights was in S.F.'s best interest. According to Wacker-Gray, S.F. indicated he wanted to stay with his grandparents but still be able to see his parents and dogs, which lived with respondent. S.F.'s grandparents recognized S.F.'s relationship with both his parents and understood S.F. still wanted to be able to see them and the dogs.

¶ 34        According to Wacker-Gray, this was S.F.'s second time living with his grandparents. Further, S.F. had been living with his paternal grandparents for over two years. The grandparents provided S.F. with stability, continuity of affection, and a sense of security. They also met S.F.'s physical needs. S.F. was developing a sense of identity living with his grandparents. He felt valued and secure, had the support of extended family, went on vacations, and spent time with his older sibling. Further, he had his own room, which he was able to personalize, in a home where only he and his grandparents lived.

¶ 35        In addition, Wacker-Gray stated S.F. was doing better in school and currently was a straight "A" student. He had fewer disciplinary issues and was more focused. He had a large group of friends in his grandparents' neighborhood, at his school, and through his wrestling club. In addition, his grandmother was very involved in his schooling and extracurricular activities.

¶ 36        According to Wacker-Gray's testimony, S.F. needed a caregiver who was stable

and could properly supervise him, help him with his homework, and take him to his extracurricular activities. S.F.'s grandparents could do these things for him. In addition, Wacker-Gray testified the best environment for S.F. was with his grandparents, who wanted to provide S.F. with permanence through adoption.

¶ 37 Based on the record in this case, the trial court's decision to terminate respondent's parental rights was not against the manifest weight of the evidence. The evidence presented in this case clearly supports the court's best interests determination.

¶ 38 III. CONCLUSION

¶ 39 For the reasons stated, we affirm the trial court's judgment.

¶ 40 Affirmed.