NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 240421-U

NO. 4-24-0421

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 21, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* G.C, a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Tazewell County |
|     Petitioner-Appellee, | ) | No. 20JA271 |
|     v. | ) | |
| Ashley W., | ) | Honorable |
|     Respondent-Appellant). | ) | Timothy J. Cusak, |
| | ) | Judge Presiding. |

JUSTICE LANNERD delivered the judgment of the court.
Presiding Justice Cavanagh and Justice Doherty concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed the trial court's judgment terminating respondent's parental rights, concluding the court's best interest determination was not against the manifest weight of the evidence.

¶ 2    In November 2022, the State filed a petition to terminate the parental rights of respondent, Ashley W., as to her minor child, G.C. (born in 2020). In February 2024, the trial court found termination of respondent's parental rights was in the minor's best interest. G.C.'s father is not a party to this appeal.

¶ 3    Respondent appeals, arguing the trial court's best interest determination was against the manifest weight of the evidence. We affirm.

¶ 4    I. BACKGROUND

¶ 5    In October 2020, the State filed a petition to adjudicate G.C. neglected under the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq.* (West 2020)), alleging

G.C. was in an environment injurious to her welfare (705 ILCS 405/2-3(1)(b) (West 2020)). In particular, the State alleged (1) G.C.'s father pushed respondent against a wall and pulled respondent's hair in the presence of G.C.; (2) respondent damaged a vehicle with G.C. inside while she was under the influence of alcohol or another substance; (3) respondent left G.C. alone in a hotel room to go drink with strangers and then brought one of the strangers back to the hotel; (4) respondent had mental health and substance abuse issues; and (5) respondent had a criminal history. In January 2022, trial court adjudicated G.C. neglected, found respondent unfit, made G.C. a ward of the court, and placed guardianship and custody with the Illinois Department of Children and Family Services (DCFS).

¶ 6        In November 2022, the State filed a petition for termination of parental rights, alleging respondent was unfit under section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2022)) for failing to make reasonable progress toward the return of G.C. to her care within nine months after the adjudication of neglect. The State alleged a nine-month period of February 2, 2022, to November 2, 2022.

¶ 7        In July 2023, respondent stipulated to the unfitness allegations of the petition. As a factual basis, the State provided facts showing respondent (1) was not progressing in counseling; (2) failed to attend all drug drops; (3) tested positive on multiple occasions for alcohol, marijuana, and medications not prescribed to her; (4) failed to complete a domestic violence class; (4) remained in a relationship with her domestic abuser; and (5) failed to complete substance abuse treatment. The trial court found respondent unfit by clear and convincing evidence and that finding is not at issue on appeal.

¶ 8        In February 2024, the trial court conducted a best interest hearing. The court accepted a best interest report prepared by DCFS. The report noted G.C. was placed with foster

parents who were willing and able to adopt her. The foster parents met G.C.'s basic needs of food, shelter, clothing, and health care. The home was observed to be in good condition, with no safety hazards or concerns. G.C. was the only child in the home and had her own bedroom. The foster parents provided an abundance of toys and learning materials. G.C. was in good health. She had lived with her foster parents for nearly her whole life, viewed them as her "true parents," and was bonded with them.

¶ 9 The report noted G.C. appeared to enjoy visits with respondent and had a bond with her. Generally, visits went well. However, the report also noted that G.C. had significant anxiety surrounding visits with respondent. After the visits, G.C. struggled with emotional regulation.

¶ 10 The report further questioned whether respondent could remain in her current home due to financial concerns, as respondent did not provide pay stubs to verify her income. Ultimately, the report expressed concern respondent did not consistently apply the skills acquired through services and noted the disruption a change in care would cause to G.C. Thus, DCFS recommended it was in the best interest of G.C. to terminate respondent's parental rights.

¶ 11 Howard Krueger, the current caseworker, testified G.C. had been in the same foster home since 2020. Krueger generally testified consistent with the information provided in the DCFS report. Krueger further testified G.C. referred to her foster parents as " 'mom' " and "' dad' " and referred to respondent as " 'Momma Ashley.' " Krueger stated G.C. saw both respondent and her foster mother, Jennifer P., as her mothers. However, he opined G.C. was bonded more to Jennifer. G.C. also acted out after visits with respondent. Krueger testified respondent missed only a few visits with G.C. Those were due to transportation issues or illness, and all were rescheduled. Krueger acknowledged respondent provided comfort to G.C. during her visits by bringing food

and gifts. Krueger also had no concern about G.C.'s safety during the visits. All visits between respondent and G.C. were supervised.

¶ 12 Krueger also testified about an incident in which respondent gave G.C. a key to her home and told G.C. she would be coming to live there. The incident was confusing to G.C. and upset her.

¶ 13 Jennifer testified G.C. had lived with her and her foster father since October 2020. Jennifer stated she loved G.C. like a daughter and wanted to provide permanency for G.C. through adoption. Jennifer testified about the incident in which respondent gave G.C. a key, stating it caused G.C. frustration, confusion, and sadness. In addition to handing G.C. the apartment key, respondent showed G.C. pictures of what would be G.C.'s bedroom. When G.C. returned home from the visit, she reacted negatively to the key by "slamming it on the ground and saying 'no,' " and she fearfully asked Jennifer if she was going to be leaving. Jennifer also testified G.C., in the past several months, did not want to attend visits with respondent and displayed anxiety and fear before visits.

¶ 14 Respondent testified and admitted she had experienced housing instability in the past, including living in five or six places since the opening of the case, "couch surfing," and spending time in substance abuse facilities. However, she had been living at the same apartment since May of the prior year. Respondent stated she had been employed since October and had no issues making her rent payments. Although respondent had a valid driver's license, she said she stopped driving due to physical injuries sustained from an accident in 2018. Respondent used public transportation and Uber, and generally did not have any impediments to attending visits with G.C.

¶ 15 Additionally, respondent testified about her activities with G.C. during visits. Respondent said she greatly enjoyed her visits with G.C. They painted and played together, and respondent brought G.C. gifts. She testified she gave G.C the apartment key to show she cared and that G.C. would always have a place with her. Respondent did not intend to cause any damage.

¶ 16 Respondent also testified she had received treatment throughout the duration of the case. She attended therapy twice per week and learned how to confront and deal with childhood trauma, how to change her negative behaviors, and that behavior modification was possible. In November 2023, respondent completed a parental capacity and bonding evaluation. That report noted in part that respondent was capable of being an adequate parent.

¶ 17 Respondent testified she was not in a sexual relationship with anyone but was being courted by a man named John who worked as an executive chef at a restaurant. She stated he did not have a criminal record. Regarding substance abuse, respondent testified she had a positive test for "benzos" in April 2023, which she believed was caused by smoking a laced marijuana joint. She also took Suboxone. Respondent admitted she struggled with substance abuse. She became dependent on Xanax at an early age and tested positive for other substances as well. She had also resided in detox facilities in the past. Respondent stated she learned through drug treatment that if she worked through her issues and took a step back and thought about it logically, she could work through situations without being dependent on anything or anybody else. She stated she had not knowingly consumed or ingested any drug other than cannabis since April 20, 2023.

¶ 18 Respondent testified she completed a 12-week domestic-violence program, as well as individual counseling, following a domestic incident with her ex-husband in February 2023. She stated she no longer maintained contact with her ex-husband and had become closer with her family. Her divorce was finalized in January 2024.

¶ 19    The guardian *ad litem* (GAL) reported G.C. was "extremely well bonded" to her foster parents. G.C. was well cared for and comfortable in their care. Listing statutory factors to be considered by the trial court, the GAL recommended the court terminate respondent's parental rights and change the permanency goal to adoption.

¶ 20    The trial court found it was in G.C.'s best interest to terminate respondent's parental rights. The court found although respondent's last positive drug drop had been 10 months ago, that was 3 years into the case. The court noted an inconsistency related to respondent's report as to why she did not drive in light of a previous report that she drove while intoxicated with G.C. in the vehicle. The court acknowledged respondent had engaged in services but observed she did so too late, instead of in the first year of the case. Meanwhile, the court noted the foster parents had cared for G.C. for much of her life. The court noted the State and the GAL had covered the statutory best interest factors, mentioned several of them, and found "every single one of those factors inures to the benefit of the [foster parents]." Ultimately, the court found G.C. needed permanency. Accordingly, the court terminated respondent's parental rights and changed the permanency goal to adoption.

¶ 21    This appeal followed.

¶ 22                                    II. ANALYSIS

¶ 23    On appeal, respondent challenges only the trial court's best interest determination, arguing it was against the manifest weight of the evidence.

¶ 24    Under section 2-29(2) of the Juvenile Court Act (705 ILCS 405/2-29(2) (West 2022)), the involuntary termination of parental rights involves a two-step process. First, the State must prove by clear and convincing evidence the parent is "unfit," as that term is defined in section

1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022)). *In re Donald A.G.*, 221 Ill. 2d 234, 244, 850 N.E.2d 172, 177 (2006).

¶ 25        After a trial court finds a parent unfit, "the court then determines whether it is in the best interests of the minor that parental rights be terminated." *In re D.T.*, 212 Ill. 2d 347, 352, 818 N.E.2d 1214, 1220 (2004). "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *D.T.*, 212 Ill. 2d at 364. The State must prove by a preponderance of the evidence termination of parental rights is in the minor's best interest. *D.T.*, 212 Ill. 2d at 366. In making the best interest determination, the court must consider the factors set forth in section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2022)). These factors include:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties, including familial, cultural, and religious; (4) the child's sense of attachments, including love, security, familiarity, and continuity of affection, and the least-disruptive placement alternative; (5) the child's wishes; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parental figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the persons available to care for the child." *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071, 918 N.E.2d 284, 291 (2009) (citing 705 ILCS 405/1-3(4.05) (West 2008)).

"The court's best interest determination [need not] contain an explicit reference to each of these factors, and a reviewing court need not rely on any basis used by the trial court below in affirming

its decision." *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19, 8 N.E.3d 1258. On review, "[w]e will not disturb a court's finding that termination is in the [child's] best interest unless it was against the manifest weight of the evidence." *In re T.A.*, 359 Ill. App. 3d 953, 961, 835 N.E.2d 908, 914 (2005). "A finding is against the manifest weight of the evidence only if the evidence clearly calls for the opposite finding [citation], such that no reasonable person could arrive at the [trial] court's finding on the basis of the evidence in the record [citation]." (Internal quotation marks omitted.) *In re J.H.*, 2020 IL App (4th) 200150, ¶ 68, 162 N.E.3d 454.

¶ 26 Here, the evidence demonstrated G.C. had a strong bond with her foster parents. The foster parents provided for G.C.'s needs, including food, clothing, shelter, and medical care. G.C had her own room, toys, and learning materials, and she expressed a desire to remain with her foster parents. The foster parents wanted to provide permanency for G.C. While respondent had made efforts to correct the circumstances that led to G.C.'s removal, as the trial court noted, she did so too late. Further, the court observed G.C. needed permanency, and the foster parents, who had cared for her most of her life, were able to provide that. The court considered the evidence in relation to the statutory best interest factors and found all of them weighed in favor of terminating respondent's parental rights. We cannot conclude the evidence in the record "clearly calls for the opposite finding" or is such that "no reasonable person" could find as the court found. (Internal quotation marks omitted.) *J.H.*, 2020 IL App (4th) 200150, ¶ 68. Accordingly, the court's best interest determination was not against the manifest weight of the evidence.

¶ 27 III. CONCLUSION

¶ 28 For the reasons stated, we affirm the trial court's judgment.

¶ 29 Affirmed.