2020 IL App (2d) 191003-U
No. 2-19-1003
Order filed March 23, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23(c) and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* B.H., O.H., Minors | ) | Appeal from the Circuit Court |
| | ) | of Winnebago County. |
| | ) | |
| | ) | No. 17-JA-295, 17-JA-296 |
| | ) | |
| (People of the State of Illinois, | ) | Honorable |
| Petitioner-Appellee, v. Mark H., | ) | Mary Linn Green, |
| Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices McLaren and Bridges concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The order terminating respondent's parental rights is affirmed as the trial court's findings on the children's best interests were not against the manifest weight of the evidence.

¶ 2    On September 26, 2019, the trial court determined that respondent, Mark H., is unfit to parent B.H. and O.H. On October 23, 2019, the trial court determined that it was in the children's best interests that respondent's parental rights be terminated. For the reasons set forth below, we affirm the trial court's findings.

¶ 3                           I. BACKGROUND

¶ 4 On September 15, 2017, the State filed a three-count petition alleging B.H. (born January 1, 2017) and O.H. (born January 21, 2016) were neglected minors.[1] Count 1 pertained exclusively to B.H. and alleged that he was born with cocaine or a metabolite of cocaine in his system. See 750 ILCS 405/2-3(1)(c) (West 2018). Count 2 alleged that both B.H. and O.H.'s environment was injurious to their welfare due to their mother's substance abuse problem which prevented her from properly parenting pursuant to section 2-3(1)(b) of the Juvenile Court Act (the Act). Count 3 alleged the minors' environment to be injurious to their welfare under section 2-3(1)(b) of the Act, in that they were left in the care of adults who did not know their names and their home had been condemned due to its being ridden with dog feces, cockroaches, and emaciated animals.

¶ 5 The Department of Children and Family Services (DCFS) provided a statement of facts attached to the State's neglect petition. DCFS's investigator reported that on September 14, 2017, police responded to the minors' home and found it to be in deplorable condition. The children were at that time in the care of adults who did not know B.H. or O.H.'s names and appeared to be "simple," as well as their grandmother who suffered from dementia. Police discovered 15 emaciated dogs and issued a warrant for respondent and the minors' mother (S.B.) for aggravated cruelty to animals. A warrant was also issued for both parents for abuse of the elderly grandmother. Dog feces and urine were found throughout the home. O.H. slept in a pack-and-play full of cockroaches and urine. Infant B.H. slept in a swing covered with dog feces and urine. The home was condemned after the minors were taken into protective custody.

---

[1] The minors' sibling, L.H., was also named in the neglect petition but is not a party to this appeal.

¶ 6    On January 11, 2018, the trial court entered an order of adjudication. The minors' mother stipulated that B.H. was neglected as to count 1 of the neglect petition, and respondent did not object. On agreement, counts 2 and 3 were dismissed as to B.H. Count 2 of the neglect petition was dismissed as to O.H., on the condition that respondent complete all services to the remaining counts. O.H. was adjudicated as neglected as to Count 3 of the State's neglect petition.

¶ 7    The trial court held a permanency review hearing on July 10, 2018. Respondent was not present for the hearing as he was incarcerated in the Illinois Department of Corrections (IDOC) and had not been in contact with his appointed counsel. After reviewing the service reports from DCFS, the trial court found respondent to have made no reasonable progress and no reasonable efforts towards the return of the minors to his care.

¶ 8    Another permanency review hearing was held on January 10, 2019. Again, after reviewing the service reports from DCFS, the trial court found respondent to have made no reasonable progress and no reasonable efforts towards the return of the minors to his care.

¶ 9    On July 2, 2019, prior to the scheduled permanency review hearing, the trial court admonished S.B. as she expressed her desire to execute final and irrevocable consents to the adoption of B.H. and O.H. The consent to adoption of B.H. expressed S.B.'s agreement to his adoption by Jayson W. and Kimberly W. The consent to the adoption of O.H. expressed S.B.'s agreement to her adoption by Derrick A. and Michelle A. Both couples had been acting as the minors' respective foster parents throughout the pendency of the proceedings. The two foster families reside across the street from one another.

¶ 10   Following the trial court's admonishments, S.B. signed the consents to her children's adoptions. The trial court then proceeded to the permanency review. Respondent was found to have made no reasonable efforts or reasonable progress during the review period. He remained in

IDOC and had not cooperated with services or communicated with his DCFS caseworker, nor had he inquired as to how his children were doing in foster care. In addition to its findings on respondent's lack of efforts and progress, the trial court order reflected that the minors' goal be changed to substitute care pending termination of respondent's parental rights.

¶ 11   On August 27, 2019, the State filed a motion for termination of respondent's parental rights and power to consent to B.H. and O.H.'s adoption. The motion consisted of five counts. The State alleged that respondent (1) failed to maintain a reasonable degree of interest, concern or responsibility as to the minors' welfare pursuant to section 1(D)(b) of the Adoption Act; (2) failed to protect the minors from conditions within the environment injurious to their welfare pursuant to section 1(D)(g) of the Adoption Act; (3) failed to make reasonable efforts to correct the conditions that caused the children to be removed during a nine-month period (from January 11, 2018 through October 11, 2018 and/or October 12, 2018 through July 2, 2019) after adjudication of neglect pursuant to section 1(D)(m)(i) of the Adoption Act; (4) failed to make reasonable progress towards the return of the children during any nine-month period (from January 11, 2018 through October 11, 2018 and/or October 12, 2018 through July 2, 2019) after an adjudication of neglect pursuant to section 1(D)(m)(i) of the Act; and (5) is depraved under section 1(D)(b) of the Adoption Act.

¶ 12   Respondent was arraigned on the State's motion to terminate his parental rights on August 27, 2019. While present and represented by counsel, respondent was tendered the State's motion regarding both minors. Respondent's counsel stated to the trial court that he would waive any further arraignment and that respondent was set to be released from IDOC custody on September 13, 2019. The trial court then issued an agreed continuance order, setting hearing dates of

September 26, 2019, and October 23, 2019, on the State's motion to terminate respondent's parental rights.

¶ 13    The trial court commenced with the unfitness portion of the hearing on the State's motion on September 26, 2019. At the outset, respondent's counsel made a motion to continue the hearing due to respondent's recent release from IDOC and his desire to engage in services with DCFS. The trial court denied the motion and stated that

> "We will continue with the proceeding today. I can appreciate the fact that [respondent] just got out of prison, but that's not on the kids and the kids have been waiting and waiting and we can't make children wait forever. So I believe it's in their best interest to proceed today."

¶ 14    The trial court then admitted certified copies of respondent's convictions and the State called the lone witness of the proceedings, Megan Denk, to testify. Denk worked as a child welfare specialist with Lutheran Social Services since the case opened in September 2017, aside from a brief period of maternity leave. The State then offered People's Exhibits 2-5; DCFS service plans from March 9, 2018, September 13, 2018, March 12, 2019, and September 18, 2019. Denk stated that she met with respondent in September 2017 when he was being held in the Winnebago County Jail. She spoke with respondent via video conference wherein he requested that the minors not be brought to the jail for visits. Denk honored respondent's request. In April 2018, respondent was sentenced and transferred to IDOC. Respondent never requested any visits with the minors, and none occurred. Respondent never sent any letters or cards to his children while incarcerated. He never inquired, or had someone else inquire on his behalf, as to their well-being. Denk sent respondent letters every month detailing what services were available in IDOC with which he could engage to progress towards the return of his children upon his release and encouraged him

to engage. He never communicated with Denk in any way during his incarceration. At no time did he participate in any requisite service.

¶ 15 On cross-examination, Denk testified that respondent met with her earlier in the week prior to the hearing. He told her that he wished to engage in services. Denk provided respondent with information regarding services that he could engage in at that time. The State then rested. Respondent informed the trial court that he had no evidence to present and rested as well. Following closing arguments, the trial court then continued the hearing until October 23, 2019, to render judgment on the unfitness portion of the State's motion.

¶ 16 In finding respondent unfit to parent B.H. and O.H., the trial court stated as follows:

"[T]he Court finds [respondent] *** to be unfit pursuant to [Counts 1-5 of the State's motion to terminate parental rights]. That proof was by clear and convincing evidence.

***

The entire time that Ms. Denk has been the caseworker, there have been no visits with his two minors. There has been no cards, gifts or letters sent to them.

He has been in communication with the worker. She sent him letters almost every month but did not receive any letters from him.

She did communicate with [respondent] and gave his attorney service plans and reports. No one communicated with her about [respondent's] minors for him.

***

In the two time periods cited in the petitions, January 11, 2018, to October 11, 2018, and October 12, 2018, to July 2, 2019, there were no steps taken toward placement of the minors with [respondent]. There were no services and no movement toward placement.

\*\*\*

As for the \*\*\* depravity count, there was evidence of four felony convictions, three within the last five years. This successfully raised the presumption of depravity, and that presumption remained unrebutted within the evidence. There was no evidence presented that would go to rebut that presumption.

Basically because of his repeated convictions and incarcerations, [respondent] is able to provide no home, no income and has had no involvement with his minors.

\*\*\*

As to the Count No. 2 \*\*\* which goes to an environment injurious to the minors, he was indicated back in October of 2017 for environmental neglect as to \*\*\* the minors and has been indicated by [DCFS] at least two times for that.

The Indicated Packet was quite voluminous and included at least, I would say, four or five separate investigations of the family.

The pictures in that Indicated Packet were horrendous. They picture an awful environment in which the minors had to live, including 11 puppies and four adult dogs all living in a one to two-bedroom apartment with feces and urine all over the floor.

Children were pictured with roaches crawling all over them and all over the place where they slept and lived and ate. And it just makes you wonder how kids can even survive in an environment like that.

As to the counts of no reasonable efforts and no reasonable progress \*\*\*. According to the Permanency Review Orders, [respondent] was found to have made no reasonable efforts and no reasonable progress on the following dates: July 10, 2018, January 10, 2019, July 2, 2019.

[A]s to the cases that raised the presumption of depravity as cited by the State and noted by this court, the Winnebago County cases of 14 CF 3041, 16 CF 2393, 17 CF 2292, *** which [was] for abuse and neglect of an elderly caregiver, and *** aggravated cruelty to animals ***.

Also presented into evidence was Will County Case No. 11 CF 2209, aggravated criminal sexual abuse.

So I think I have given more than enough factual bases for the Court's decision and ask now if the attorneys are ready to move to a best interest.

The attorneys answered in the affirmative and the State's motion proceeded to the best interest portion of the hearing.

¶ 17    Megan Denk was again called to testify. She stated that O.H. and L.H. had been placed in a traditional foster home in which they have lived since September 2017. The foster home consists of the foster parents, their two biological children, an adopted child, another foster placement, and L.H. and O.H. Denk had observed O.H. in the foster home and testified that she has a very close relationship with both foster parents. She looks to them for comfort, support, and anything needed in the house. Denk said that O.H. has a typical sibling relationship with the other children in the home. They enjoy doing activities together, playing outside together, doing arts and crafts in the home together, and get along very well. O.H. was enrolled in preschool at the time of Denk's testimony. She had no special education or medical needs. Both foster parents are responsible for keeping O.H. up to date on regular medical care. O.H. had taken family vacations, celebrated birthday parties and holidays with the foster family and their extended family.

¶ 18    Denk then testified that she had the opportunity to observe O.H. and respondent during a supervised visit the week prior to the best interests hearing. She stated that O.H. was very nervous

during the visit and did not want to interact with respondent. O.H. sat on Denk's lap the entire visit. Denk described O.H.'s interaction with respondent as completely different than her interaction with her foster parents. O.H. is very comfortable around her foster parents when Denk visits the home. She talks to them, interacts with them about her daily activities, and prefers them to Denk. Denk recalled that she had never seen O.H. appear as nervous and uncomfortable as she was during the supervised visit with respondent.

¶ 19    Denk then testified that B.H. is in a separate traditional foster home which he has lived in since September 2017. The home consists of the foster parents, their three biological children, B.H., and two other foster placements. Placing all three siblings together was not possible at the outset of the case, but the foster families have made sure they are very close. The families live in very close proximity, across the street from each other in the same housing development, and the siblings get together frequently. Denk stated that B.H. is very closely bonded to his foster parents. He is very excited when his foster father comes home as he runs to him. He is always running to his foster mother and excited to talk to her. He seeks his foster mother for comfort. B.H. adores his foster siblings as well and is very bonded with all of them. B.H. has no special educational or medical needs. Both foster parents are responsible for his educational upbringing and medical care. He goes on family vacations, celebrates birthday parties and holidays with his foster family and their extended family.

¶ 20    Regarding B.H.'s interaction with respondent at the supervised visit, Denk testified that B.H. didn't interact with respondent. She described this as different from her observations of B.H. in the foster home where he interacts with everyone. B.H. did not seem interested in respondent during the supervised visit and directed all requests for food or water to Denk, not respondent.

¶ 21    Denk testified that it was her agency's position that respondent's rights be terminated as to both minors. She indicated that both sets of foster parents indicated a desire to adopt B.H. and O.H. into their respective homes.

¶ 22    On cross-examination, Denk admitted that respondent had acted appropriately with the children during the supervised visit. She also confirmed that respondent has indicated a desire to engage in recommended services but had not for financial reasons. Respondent's counsel then asked Denk to reiterate that DCFS would not pay for respondent to engage in services, to which the State objected. Respondent's counsel stated that his question was relevant because respondent's failure to engage in services was only due to his financial difficulties. The trial court sustained the State's objection and stated that respondent's financial inability to engage in services is not "included in any of the statutory best interest factors that the Court must consider." The State then rested.

¶ 23    The minors' guardian *ad litem* (GAL) then called Michelle A., O.H.'s foster mother, to testify. She is married to Derrick A. In addition to L.H. and O.H., the couple's home contains their biological children, their adopted child, and another foster placement child. The couple live within 200 feet of B.H.'s foster parents, Jayson and Kimberly W. Michelle A. stated that she and her husband are very close to Jayson and Kimberly W., whose home, in addition to B.H., contains an extensive set of foster siblings. The two families come and go as they please between the two houses as if it were one fluid home.

¶ 24    The GAL then introduced GAL exhibits 1-17; photographs of B.H. and O.H. engaged in various activities with their foster families. Michelle A. testified to the photographs' depiction of the families and their extended families on vacation in Florida, boating on Lake Superior, playing at a Wisconsin Dells water park, and a local pumpkin patch. The pumpkin patch photos, in addition

to their depiction of B.H. and O.H. with their families, show S.B. with her biological children. Michelle A. explained that the foster families have developed a good relationship with S.B. and that she visits their homes often. Another photo shows S.B. with O.H. while attending a softball game for O.H.'s sibling, L.H. The photos also show B.H. and O.H. engaged with the foster families during birthdays and holidays. A photograph of B.H. on the day he arrived at his foster home was also included.

¶ 25    Michelle A. added that S.B. has a good relationship with her biological children and enjoys visiting them in their homes. She testified that B.H. and O.H. refer to their biological mother as "mom [S.B.]".

¶ 26    Following closing arguments, the trial court stated that it "has considered the statutory best interest factors as they relate to each child's age and developmental stage, all of the evidence and arguments of counsel." The trial court then found "that the State has met its burden by at least a preponderance of evidence that it would be in the best interest of *** [O.H.] and [B.H.] to terminate the parental rights of [respondent]."

¶ 27    Respondent timely appealed.

¶ 28                                II. ANALYSIS

¶ 29    In this appeal, respondent raises three contentions: (1) the trial court erred in denying respondent's motion for a continuance at the commencement of the hearing on the State's motion to terminate his parental rights; (2) the trial court improperly denied admission testimony regarding respondent's inability to obtain services due to financial hardship; and (3) the trial court's finding that it was in B.H. and O.H.'s best interests to terminate respondent's parental rights was not proven by a preponderance of the evidence.

¶ 30    A parent's right to raise his or her biological child is a fundamental liberty interest, and the involuntary termination of such right is a drastic measure. *In re B'Yata I.*, 2013 IL App 2d 130558, ¶ 28. Accordingly, the Juvenile Court Act of 1987 provides a two-stage process for involuntary termination of parental rights. 705 ILCS 405/2–29(2) (West 2018). Initially, the State must prove that the parent is unfit. 705 ILCS 405/2–29(2), (4) (West 2018); 750 ILCS 50/1(D) (West 2018); *B'Yata I.*, 2013 IL App 2d 130558, ¶ 28. If the court finds the parent unfit, the State must then show that termination of parental rights would serve the child's best interests. 705 ILCS 405/2–29(2) (West 2018); *B'Yata I.*, 2013 IL App 2d 130558, ¶ 28.

¶ 31    With respect to the first stage of the termination process, section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)) lists various grounds under which a parent may be found unfit. *In re Antwan L.,* 368 Ill. App. 3d 1119, 1123 (2006). The State has the burden of proving a parent's unfitness by clear and convincing evidence. 705 ILCS 405/2–29(2), (4) (West 2018); *In re Antwan L.,* 368 Ill. App. 3d at 1123. A determination of parental unfitness involves factual findings and credibility assessments that the trial court is in the best position to make. *In re Tiffany M.,* 353 Ill. App. 3d 883, 889–90 (2004).

¶ 32    Respondent's first contention does not challenge the trial court's unfitness findings. Rather, he argues that the court abused its discretion in denying his motion for a continuance as its "sole" reason for denial was that the children cannot be made to "wait forever." He cites his desire to engage in services and the supervised visit with the minors the week before the unfitness hearings as support for this contention. He describes the trial court's denial of his motion for a continuance as "arbitrary" and that "no reasonable person would have denied the motion to continue, especially in light of the circumstances surround the motion."

¶ 33    There is no absolute right to a continuance. *In re Marriage of Gallagher*, 256 Ill. App. 3d 439, 442 (1993). When a continuance is not requested until the day of the trial, Supreme Court Rule 231(f) (IL R S Ct 231(f) (West 2018)) requires that an especially persuasive reason be given by the moving party because of the potential inconvenience to the witnesses, the parties, and the court. *Gallagher*, 256 Ill. App. 3d at 442. The decision to deny a motion for a continuance is within the sound discretion of the trial court and such decision will not be disturbed absent an abuse of discretion or unless palpable injustice appears in the record on appeal. *Gallagher*, 256 Ill. App. 3d at 442-43.

¶ 34    When he requested a continuance at the unfitness hearing, respondent had not participated in any requisite services with DCFS. He still needed to participate in—and complete—four different service programs, including substance abuse, parenting, domestic violence, and individual counseling. He had been mailed information monthly by his caseworker on how he could engage in services while housed in IDOC. He elected to ignore these invitations to participate and failed to respond in any way. He never made any attempt to visit with or contact his children at any point during his incarceration. Until days before the unfitness hearing, respondent had expressed no desire or willingness to engage in services. He met with Denk and again received information on the services he needed to complete. He maintains that he had no way to pay for these services following the State's petition to terminate his parental rights.

¶ 35    Respondent was present and represented by counsel on August 27, 2019, when arraigned on the State's motion to terminate his parental rights. Respondent's counsel indicated to the trial court that his September 13, 2019, release from IDOC was imminent and "he should be out of custody by the time of [the September 26 and October 23, 2019] hearings." Following his motion for a continuance at the unfitness hearing, the State objected, stating that

"The children have been in foster care since 2017. We have had multiple permanency review hearings, including on July 10, 2018, January 10, 2019, and July *** 2019. Our termination motions were filed. All parties were given on August 27, 2019, *** notice that the goal had been changed as of July. The petitions have been in all counsels' hand for over a month. Discovery was provided."

Agreeing with the State, the GAL stated that respondent's motion "would delay [the proceedings] at least six months to a year."

¶ 36    Respondent's argument is disingenuous when he asserts that the "sole" reason for the trial court's denial of his motion was that the children cannot be made to "wait forever". As recounted before, the trial court stated as follows in denying respondent's motion:

"We will continue with the proceeding today. I can appreciate the fact that [respondent] just got out of prison, but that's not on the kids and the kids have been waiting and waiting and we can't make children wait forever. So I believe it's in their best interest to proceed today."

The primary concern of proceedings under the Act is the best interest and welfare of the children. See *In re E.L.*, 152 Ill. App. 3d 25 (1987). Delays in termination proceedings impose serious cost on the function of the government, as well as intangible costs to the lives of the children involved. *In re A.M.*, 402 Ill. App. 3d 720, 725 (2010). Based on the foregoing, the trial court's decision to deny respondent's motion for a continuance was not an abuse of discretion as no palpable injustice appears in the record on appeal to suggest any other conclusion was proper.

¶ 37    We now move on to respondent's second contention. He contends that the trial court erred in granting the State's objection to testimony during the best interest hearing as to whether DCFS would pay for his requisite services upon his engagement. He further argues that the trial court

was wrong in reasoning that such testimony was irrelevant as it "is not included in any of the statutory best interest factors."

¶ 38 A trial judge's evidentiary rulings during a best interest hearing are subject to an abuse of discretion standard of review. *In re D.T.*, 212 Ill. 2d 347, 357 (2004).

¶ 39 Once a parent has been found to be unfit, the focus shifts to the minor. *In re D.T.*, 212 Ill. 2d at 352. All considerations must yield to the best interest of the children. *In re I.B.*, 397 Ill. App. 3d 335, 340 (2009). Whether DCFS would have paid for respondent's engagement in services was not relevant to the trial court's determination of whether it was in the minors' best interest to terminate his parental rights. See *In re L.B.*, 2015 IL App (3d) 150023, ¶ 18 (respondent's argument "that it was unclear whether services were available to her at the time of the best hearing was not relevant to the determination of whether it was in the best interest of [the minor]" to terminate respondent's parental rights). Granting the State's objection to testimony regarding DCFS's payment, or lack thereof, for respondent's services following the State's motion for termination of his parental rights as irrelevant was not an abuse of discretion.

¶ 40 Respondent's third and final contention is that the State failed to prove by a preponderance of the evidence that it was in the best interests of B.H. and O.H. that his parental rights be terminated. Although difficult to parse, this contention seems to consist of two arguments. He avers that the trial court did not weigh certain statutory best interest factors in his favor. Additionally, he argues that a permanent home had not yet been found for B.H. at the time of the best interest hearing, leaving B.H.'s future uncertain if respondent's parental rights are terminated.

¶ 41 Once the trial court finds a parent unfit, it must determine whether termination of parental rights is in the minor's best interests. *B'Yata I.*, 2013 IL App 2d 130558, ¶ 41. Section 1–3(4.05) of the Adoption Act (705 ILCS 405/1–3(4.05) (West 2018)) sets forth various factors for the trial

court to consider in assessing a child's best interests. *B'Yata I.*, 2013 IL App 2d 130558, ¶ 41. The State bears the burden of proving by a preponderance of the evidence that termination is in the best interests of the minor. *Id.* A trial court's best-interests finding will not be disturbed on appeal unless it is against the manifest weight of the evidence. *Id.* A decision is against the manifest weight of the evidence only if an opposite conclusion is clearly apparent. *Id.*

¶ 42    Section 1–3(4.05) of the Juvenile Court Act requires that, "[w]henever a 'best interest' determination is required," the court must consider, in the context of the child's age and developmental needs, the following factors: (1) "the physical safety and welfare of the child," (2) "the development of the child's identity," (3) "the child's background and ties," (4) "the child's sense of attachments," including "where the child actually feels love, attachment" and "the child's sense of security," (5) "the child's wishes and long-term goals," (6) "the child's community ties," (7) "the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives," (8) "the uniqueness of every family and child," (9) "the risks attendant to entering and being in substitute care" and (10) "the preferences of the persons available to care for the child." 705 ILCS 405/1–3(4.05) (West 2018).

¶ 43    The court may also consider the nature and length of the child's relationship with her present caretaker and the effect that a change in placement would have upon his or her emotional and psychological well-being. *In re Tajannah O.,* 2014 IL App (1st) 133119, ¶ 19. The trial court's best interest determination need not contain an explicit reference to each of these factors and we need not rely on any basis used by the trial court in affirming its decision. *Id.*

¶ 44    The evidence provided to the trial court, and reflected in the record, fully support the trial court's determination that it was in B.H. and O.H.'s best interest to terminate respondent's parental

rights. Our independent review of the evidence here would support an articulated finding against respondent with an explicit reference to each statutory best interest factor. Respondent's assertion that B.H.'s future remains in doubt as no permanent home had been indicated at the time of the best interest hearing is built on a very flimsy premise. To support his position, respondent's brief refers this court to the following statement by the State in closing argument at the best interest hearing:

> "As to [B.H.], he has resided in his foster home for basically all but six, seven months of his life. He has been living there since about September of 2017, and he was born in January of 2017. This is the only home he has any knowledge of.
>
> ***
>
> But as far as [B.H.]'s best interest goes, this is where he feels a sense of safety and security. This is where he feels at home. His relationships are with his foster parents, their extended family, his sister's foster parents. That's what he knows as his life. That's what his identity is."

We are not sure how respondent's reference to these statements by the State supports his position regarding a lack of permanence and an uncertain future for B.H. The evidence presented to the trial court on B.H.'s living situation and future suggests a far brighter, and permanent, scenario.

¶ 45   At the close of Michelle A.'s testimony, the trial court accepted GAL Group Exhibit A into evidence. Group Exhibit A is an October 20, 2019, letter written by B.H.'s foster parents, Jayson W. and Kimberly W., to the trial court regarding their experience with B.H. In affirming the trial court's finding that the State proved by a preponderance of the evidence that it was in the minors' best interest to terminate his parental rights, we conclude with B.H.'s foster parents' words on what his future holds in their home:

"Never, in our wildest dreams, did we ever think we would be where we are today. On September 13, 2017, our lives changed forever. That very evening [B.H.], a 9 month old, blond hair, blue eyed baby boy came into our home and became our 4th 'forever' love of our life.

From day 1, him being in our home has always felt right. He quickly learned to love and trust and easily acclimated to the everyday routines of our family. In addition to his 2 biological sisters, he gained 2 additional sisters *** and 1 brother in our biological children.

We have been fortunate enough to be able to maintain a strong sibling relationship between [B.H.], [L.H.] and [O.H.]. Our friendship with [L.H.] and [O.H]'s foster parents, Michelle and Derrick, was present before the children came into our lives and remains strong to this day. Through extracurricular activities and get-togethers, both planned and unplanned, [B.H] is able to see and interact with his sisters several times per week.

You may wonder what he loves. He loves to be on the go. He loves every season of sports and asks each day if we have volleyball or football (this time of the year). This summer was all about baseball and the Cubbies. He is quite the little athlete and you can always find him with a football, baseball or other kind of ball in his hands. He cheers on our children in their sporting events or whatever the activity may be, and mimics their actions through play.

What else does he love…he loves to be outside, especially at [the] farm. He loves to swing. He loves to ride a hoverboard and has been doing so since December of last year. He loves to go on the boat and swim in the lake on hot summer days. He loves to help mow the lawn with Dad and help sweep the floor and fold laundry with Mom.

[B.H.] is an amazing little boy with lots of extended family and friends that love on him as though he were their own. He loves his Grammy and Papa and Grandma Connie. He has plenty of cousins, aunts and uncles that spoil and love him as though he has always been ours. Without them and their support, we would fail in this journey. But, because they never question when another child comes into our home, we continue to say 'yes' to the children who need us.

Our wish for [B.H.] is that he always feels loved and safe. That he continues to maintain a relationship with [L.H.] and [O.H.] and know he has siblings in our biological children ***. Our hope is that he grows into an amazing young man. And, whatever choices he makes in his life, we will love, guide and support him always.

As foster parents, we have been given an amazing opportunity to make an impact on this little guy's life. We want nothing more than to give him the world. Thank you for allowing us to do so."

¶ 46                                   III. CONCLUSION

¶ 47    For the reasons stated, we affirm the circuit court of Winnebago County.

¶ 48    Affirmed.