2021 IL App (1st) 201105-U

SIXTH DIVISION
March 15, 2021

No. 1-20-1105

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| *In re* K.G., D.B., C.B., D.B., C.B., and A.B., Minors, | ) | Appeal from the |
| | ) | Circuit Court of |
| (THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Cook County |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | No. 15 JA 641-646 |
| v. | ) | |
| | ) | |
| ELENA T., | ) | Honorable |
| | ) | Nicholas Geanopoulos, |
| Respondent-Appellant). | ) | Judge Presiding. |

PRESIDING JUSTICE MIKVA delivered the judgment of the court.
Justices Harris and Oden Johnson concurred in the judgment.

**O R D E R**

¶ 1     *Held*:   The circuit court's decision that it was in the best interest of the minors that this case be closed, their wardship terminated, and their maternal great-aunt appointed as their guardian was not against the manifest weight of the evidence.

¶ 2     After this case had been in the court system for over five years, the circuit court granted a motion filed by the Department of Children and Family Services (DCFS) Guardianship Administrator to close the case and appoint Alma V., the minors' maternal great-aunt, with whom the minors had lived since shortly after the case was opened, as their guardian. The mother,

Elena T., who has completed many services during these five years and has struggled to maintain and improve her relationship with her children while this case has been pending, has appealed the court's order closing the case. While we commend Elena T. for her hard work and many successes, we do not agree with her that the circuit court's finding that closing the case to guardianship was in the best interest of the minors was against the manifest weight of the evidence. We affirm the decision of the circuit court.

¶ 3                               I. BACKGROUND

¶ 4                A. History of DCFS Involvement and Early Court Proceedings

¶ 5     Respondent Elena T. is the mother of these six minors: K.G. (born April 4, 2004), Damo. B. (born May 26, 2007), Cha. B. (born October 10, 2008), Dame. B. (born September 12, 2009), Co. B. (born April 27, 2012), and A.B. (born January 24, 2014) (collectively, the minors).

¶ 6     On June 23, 2015, the State filed petitions for adjudication of wardship and motions for temporary custody for all six minors. At that time, the oldest child, K.G., was 11 years old, and the youngest, A.B., was 1½ years old. Neither the father of K.G. nor the father of the other five minors was much involved in the circuit court proceedings, and neither is a party to this appeal.

¶ 7     In the petitions for adjudication of wardship, the State alleged that on June 20, 2015, the minors were taken into custody because they had been neglected both by being exposed to an injurious environment and by being left without supervision for an unreasonable period of time. The State also alleged that the minors were abused due to their exposure to a substantial risk of physical injury by other than accidental means. In support of these allegations, the State alleged the following facts: Elena T. had two prior indicated reports for inadequate supervision, and on June 20, 2015, the minors were found home alone and attempts to contact Elena T. were unsuccessful. K.G.'s putative father's whereabouts were unknown.

¶ 8    In support of the motions for temporary custody, an affidavit from a DCFS investigator stated that the police had been called to the home and found that Elena T. had left 11-year-old K.G. in charge of watching her five younger siblings while Elena T. went to a party, and that "[t]he landlord attempted to contact Elena [T.] 8 times and left several voicemails but there was no response." The investigator also said that Elena T. was a "known alcoholic and she continue[d] to leave her children at home inadequately supervised."

¶ 9    This case was assigned from its inception to the same judge who has presided over it ever since and who ultimately granted the DCFS petition that is the subject of this appeal.

¶ 10    The circuit court granted the petition for temporary custody on June 23, 2015. The court's visitation order entered that day required Elena T.'s visits with the minors to be supervised. By July 2015, the four older minors were placed with their great-aunt, Alma V. The two youngest were placed with Alma V. a month later. All six minors have remained in Alma V.'s home since that time.

¶ 11    On May 17, 2016, the circuit court entered an adjudication order finding that the minors were abused or neglected due to an injurious environment (705 ILCS 405/2-3(1)(b) (West 2016)). In the disposition order, entered the same day, the court adjudged the minors as wards of the court and found Elena T. to be "unable for some reason other than financial circumstances alone to care for or discipline" the minors. The minors were placed in the guardianship of DCFS with the right to place the minors. In the first permanency order, also entered that day, the court set the permanency goal at returning the minors home within 12 months.

¶ 12    At permanency hearings held on March 31, 2017, and October 31, 2017, the court retained the goal of returning the minors home within 12 months and made findings that Elena T. had not made substantial progress, although she was engaged in services and participating in supervised

visitation. On October 31, the court also expanded Elena T.'s visitation rights to include unsupervised visits of not more than four hours per week for all the minors at the discretion of DCFS and allowed K.G., who was 13 years old at the time, to have unsupervised visits with her mother at her own discretion. Elena T.'s request for unsupervised overnight visitation was entered and continued to April 23, 2018.

¶ 13    On February 1, 2018, the circuit court referred the case to the Cook County Juvenile Court Clinic (CCJCC) for a response to its request for clinical information. The court asked the CCJCC to report on the likelihood that Elena T. would be able to make the gains necessary to achieve a goal of return home and what impact changing the goal to guardianship would have on the minors. The court asked the CCJCC to recommend a goal that would be best for this family.

¶ 14                              B. The CCJCC Report

¶ 15    The CCJCC report was completed by a psychologist, Danielle Rynczak, JD, PsyD, ABPP (Forensic), and her sources included records from DCFS, Elena T., and Alma V.; in-person interviews with Elena T. and four of the minors; and telephone interviews with DCFS caseworkers, Alma V., and various service providers.

¶ 16    The report is detailed and 48 pages long. It traces Elena T.'s own history of being the victim of physical and sexual abuse. It also discusses her repeated failure to care for her children, leaving them with unreliable caretakers or in the care of her oldest child, K.G. It acknowledges her participation in and successful completion of a number of services, including therapy with K.G. Dr. Rynczak interviewed the older minors and found they were all thriving in their foster home with Alma V. and were on the honor roll. K.G. made clear she did not want to return to her mother's care. The other minors did not want to return without K.G.

¶ 17    The report discusses Elena T.'s visits with her children. Although the court had ordered

unsupervised day visits between Elena T. and the minors in November 2017, DCFS exercised its discretion to suspend those visits in January 2018, based on concerns about Elena T.'s ability to take care of the minors during unsupervised day visits. The supervised visits, which generally lasted between three and six hours, were described as being "appropriate." Elena T. usually prepared food and was able to multitask to meet the minors' differing needs. Elena T. sometimes disciplined the children during those visits, but according to the report they also "contained 'lots of laughs' and usually ended with 'hugs and kisses.' " The report further noted that caseworkers had observed a notable difference when K.G. was visiting and when she stopped her visits, reporting that K.G. was "the one who keeps" the other children quiet and peaceful.

¶ 18    Dr. Rynczak's conclusion was that some of Elena T.'s interactions with her children were protective, but she also acknowledged that some indicated a level of risk in the parent-child relationships. Dr. Rynczak noted that each minor, except for K.G., sought out Elena T. Dr. Rynczak also said that Elena T. was attentive to the minors' needs, could identify appropriate developmental expectations, and showed improvement in all areas of her parenting classes. Dr. Rynczak further stated that Elena T. had endured childhood trauma and repeated abuse, and showed an ability "to adapt and progress, despite difficult challenges."

¶ 19    As to risk factors and weaknesses that Elena T. demonstrated, Dr. Rynczak noted that the minors were exposed to domestic violence and that K.G. was often placed in the caregiver role when Elena T. was unable to care for herself. Dr. Rynczak acknowledged that this risk was "somewhat lessened" by Elena T.'s completion of the domestic violence programming but said that "more work [wa]s needed to decrease this risk." Dr. Rynczak also expressed concern that, although Elena T. knew she experienced anxiety and depression and had "generally been described as cooperative with therapeutic interventions during this case," it did not seem that Elena T. was

presently taking her medication. In addition, psychological "[t]esting results suggested that [Elena T.] was not completely forthcoming in reporting areas of psychopathology." Dr. Rynczak said that Elena T. "need[ed] to gain greater insight into how she [wa]s repeating the very behaviors that she experienced in childhood":

¶ 20   Additional risk factors and weaknesses included that Elena T. had been under investigation by DCFS at least six times and, although some service providers said that she had taken responsibility for her actions that led to DCFS involvement, Dr. Rynczak observed:

> "[Elena T.] was not able to show that she has taken responsibility for her actions during the current evaluation. She continually highlighted that she was not indicated on early reports, that family members made false allegations against her, that she always had an adequate care plan and that family members and other adults were at fault for not following the care plan. Her failure to take responsibility for her actions shows a lack of insight into decision-making processes, and parenting choices, and the impact neglect has had on her children."

Dr. Rynczak also noted that Elena T. showed interest in participating in family therapy with K.G., but that at the same time Elena T. blamed others for her impaired relationship with K.G., and that the four oldest children all had trust issues with Elena T.

¶ 21   With respect to the likelihood of Elena T. being able to adequately care for, parent, and protect the minors, Dr. Rynczak concluded that it seemed Elena T. was "generally able to attend" to the physical needs of Damo., Cha., Dame., Co., and A.B. during supervised visits, but "several risk factors" indicated that she might not be able to do the same during unsupervised visits. Elena T. had a long history of being in abusive relationships and "[t]he unmitigated risk associated with domestic violence exposure suggests it is less likely than not that [Elena T.] will be able to

keep her children safe during unsupervised contact at this time." As to K.G., Dr. Rynczak said that K.G.'s "expressed desire not to participate in unsupervised visits suggests even greater challenges to unsupervised contact at this time."

¶ 22    Dr. Rynczak concluded that Elena T.'s ability to make the gains necessary to accomplish the goal of reunification was "low." Specifically, Dr. Rynczak expressed concern about Elena T.'s "persecutory belief system that leads to a lack of insight, isolative behaviors, distrust of others, and an inability or unwillingness to take responsibility for her own behavior."

¶ 23    Dr. Rynczak's ultimate conclusion in the CCJCC report was that changing the permanency goal to guardianship "would allow [Elena T.] more time to accept responsibility for her actions and repair" the relationships and trust with her children and would allow the minors to continue to thrive, "surrounded by what they perceive to be a loving family." Guardianship could also "be more harmful [than termination] to her children's emotional well-being if [Elena T.] does not make progress."

¶ 24    The CCJCC report was filed with the circuit court on July 12, 2018. That same day, the court entered permanency orders changing the minors' goals from return home to private guardianship. On September 15, 2020, DCFS filed a motion to vacate guardianship, terminate wardship, and close the case, as well as a petition to appoint Alma V. as the minors' guardian. On the same day, at the request of their guardian *ad litem*, the judge met with the minors as a group via Zoom with only the minors, the judge, and the attorney and guardian *ad litem* present. No record was made of that interview.

¶ 25                                C. The Hearing

¶ 26    The circuit court held a hearing on the DCFS motion and petition on September 21 and 28, 2020. Elena T. was present at the hearing via Zoom. Before any witnesses were presented, the

exhibits were admitted into evidence and the judge stated that he had read "[a]ll the exhibits, I have read every single one that w[as] tendered to me."

¶ 27    DCFS submitted only one exhibit—the CCJCC report, and it was admitted by the court without objection.

¶ 28    Elena T. submitted 11 exhibits, also admitted by the court without objection. Elena T.'s group exhibit 1 included reports from Howard Counseling Services from August 2015 through when she was discharged on February 20, 2017, having made "excellent progress" and concluding that she no longer needed therapy.

¶ 29    Exhibit 2 was the November 24, 2015, treatment discharge summary from the outpatient addiction center program at Loretto Hospital, showing Elena T. had successfully completed 75 hours in the program.

¶ 30    Elena T.'s group exhibit 3 included reports and a certificate reflecting her successful completion of the Nurturing Parenting Program at Children Home & Aid on October 5, 2016.

¶ 31    Elena T.'s group exhibit 4 documented her successful completion of domestic violence prevention counseling through the Westside Health Authority on October 24, 2017.

¶ 32    Elena T.'s group exhibit 5 consisted of reports from her participation in the Child Parent Psychotherapy program with Co. and A.B. from August 23, 2017, through October 25, 2017. The reports noted that Elena T. was "engaged and receptive to services," "thoughtful, and cooperative," willing to discuss why she thought the minors became involved with DCFS, and able to provide Co. and A.B. with comfort and reassurance. These reports also noted progress in Elena T.'s relationships with Co. and A.B.

¶ 33    Elena T.'s group exhibit 6 consisted of reports from family behavioral therapy services Elena T. and the minors participated in at Mary and Tom Leo Associates. The first report covered

the period from July 27, 2017, through October 30, 2017, and the therapy was between Elena T. and K.G. only, who was 13 years old at the time of the report. The therapist recommended terminating the service because K.G. was overcommitted schedule-wise but observed that Elena T. and K.G. had made progress and that "[i]t is clear the two have a strong bond." For a return home goal, the therapist said that Elena T. needed to learn appropriate and healthy ways to parent her children by participating in family behavioral therapy.

¶ 34    The second family therapy behavioral report involved all six minors and covered the period from November 7, 2017, through February 19, 2018. The therapist observed that caring for all her children would "be challenging on time and resources," but Elena T. assured the therapist she would be able to support her children. During this time, Elena T. gained unsupervised visits with the minors. The therapist had nine specific treatment goals for Elena T., including increasing the bond with her children, learning how to engage in age-appropriate interactions with them, and learning how to create a safe environment for them. The therapist recommended that Elena T. continue with family behavioral therapy "to instill consistent parenting skills and decision making with the children" and continue to work with her individual therapist.

¶ 35    The third family behavioral therapy report covered the period from February 19, 2018, through May 19, 2018. Elena T. was having supervised visits with the minors during this time, but K.G. was no longer attending those visits. In the report, the therapist listed the same nine goals as having been worked on during that time and concluded by recommending continued individual and family behavioral therapy for Elena T.

¶ 36    Elena T.'s exhibits 7 and 8 were submitted to demonstrate her improved economic circumstances. Exhibit 7 was a 2019 income tax return showing her adjusted gross income of $24,670. Group exhibit 8 was a series of documents relating to the estate of Elena T.'s godmother,

for whom Elena T. was the only heir. Elena T.'s godmother's estate included $25,000 in personal property and $350,000 in real property.

¶ 37    Elena T.'s group exhibit 9 included letters of support for Elena T. The first was written by a staff attorney at the Shriver Center on Poverty Law who discussed Elena T.'s participation in a working group of parents, the second was from a coordinator at the Westside Health Authority who discussed Elena T.'s volunteer work there, and the third was from an individual who Elena T. had helped to repair her credit and get through her post-traumatic stress disorder.

¶ 38    Elena T.'s group exhibit 10 consisted of a set of mental health assessments completed by the Catholic Charities of the Archdiocese of Chicago, Department of Youth and Family Therapeutic Services, between April and May 2018 on Damo., Cha., and Dame. Each child was reported as saying they enjoyed living with and had a strong relationship with Alma V., but that they also wanted to try unsupervised visits with Elena T. Damo. and Cha. both indicated they wanted to return home to live with Elena T. But both Cha. and Dame. also expressed feeling safer when Elena T. had supervised visits, though they could not articulate why. The evaluator concluded that Cha.'s inability or unwillingness to report why she felt unsafe was a risk factor and noted that Dame. seemed to be experiencing distress about unsupervised time with Elena T.

¶ 39    Elena T.'s exhibit number 11 was an October 2017 letter to an assistant public defender about Elena T.'s attendance at the domestic violence program at Sarah's Inn.

¶ 40    The witnesses presented by DCFS were Zshoan Lathan, the family's caseworker since January 2019, and Alma V.

¶ 41    Ms. Lathan testified that the minors' ages presently ranged from 6 to 16 years old and they had been placed with their great-aunt, Alma V., for approximately five years, or since 2015. Ms. Lathan said the home was safe and appropriate and there were no signs of abuse or neglect. Ms.

Lathan believed the minors were all Catholic. With respect to the guardianship petition, Ms. Lathan said that Elena T. still wanted the minors to return home to her, but if they could not be with her "she would like for them to stay with Alma [V.]."

¶ 42    Ms. Lathan said that the minors wanted to stay together and they wanted to remain with Alma V.—"they are very settled and comfortable and bonded with Ms. Alma [V.], and they don't want to be disrupted from that arrangement." Because K.G. was over the age of 14—16 at the time of the hearing—she was required to sign a document nominating Alma V. as her private guardian, and she did so in March 2019. Ms. Lathan also said she consistently spoke with the younger minors about their wishes during her monthly visits—they like going to their mother's home but they wanted to stay together. Ms. Lathan said, "they're going to do what the oldest does, and the oldest doesn't want to go home, and they also understand that Alma V. loves them. Alma V. is providing care for them, meeting their physical needs, and that's what they know, and that's what they want to continue to be at."

¶ 43    As to the possibility of adoption, Ms. Lathan said that Alma V. had declined because she understood that the children still had a relationship with their mother and "the need for them to continue with their relationship and adoption would—was not something she would support." Ms. Lathan said that Alma V. was supportive of the relationship between Elena T. and the minors and was willing to provide Elena T. with the one visit per month, supervised or unsupervised. Ms. Lathan also said that Alma V. invited Elena T. to family functions. The younger five children expressed a desire to see Elena T. more. Ms. Lathan testified that, although the guardianship order only requires a visit between Elena T. and the minors once per month, each of those visits would "have to be at least two hours or more." Ms. Lathan also explained that the once-per-month visits in the order would indeed be a minimum and more visits could occur.

11

¶ 44    Ms. Lathan concluded that the case closing would not harm the minors because they "consider where they are at as home," they have a routine and are "very settled and attached to the caregiver, and the arrangement that has been going on, even with the mom visiting, they are comfortable, and they're doing well." Ms. Lathan recommended private guardianship be granted to Alma V. as the result that would be in the minors' best interest.

¶ 45    Alma V. testified that the minors had lived with her since 2015 and she wished to become their private guardian and have them remain with her. She understood that the guardianship arrangement would allow Elena T. to visit at least once per month; Alma V. said she was willing to accommodate the visitation and she was supportive of the minors' relationship with Elena T.

¶ 46    DCFS then rested, and the State and the public guardian also rested.

¶ 47    Elena T. first presented the testimony of Elizabeth Dadabo, a clinical social worker and certifiied alcohol and drug counselor, as an expert in clinical social work. Ms. Dadabo saw Elena T. between 10 and 15 times over six months at the Mile Square Health Center, starting in the spring of 2019. Ms. Dadabo did a mental health evaluation with Elena T. and diagnosed her with an adjustment disorder specifically related to the minors not being in her care. Ms. Dadabo testified that Elena T. also consistently screened negative for depression and anxiety. Ms. Dadabo concluded that Elena T. did not need psychotropic medication.

¶ 48    Ms. Dadabo testified that Elena T. had made "significant progress" before seeing her. While Elena T. and Ms. Dadabo worked together, Elena T. said she started some nonprofit work and was working as a security guard. Ms. Dadabo said that Elena T. "was able to hold that job down pretty successfully, and it just seemed like she was doing a good job of staying focused and on track." Ms. Dadabo said that her relationship with Elena T. ended because Mile Square uses a "brief intervention model," so there is no expectation that its relationship with a patient will be

long term.

¶ 49    Ms. Dadabo said that she reviewed the CCJCC report, including the conclusions and recommendations for services. She did not think Elena T. was, at the time of the hearing, at any more of a risk of entering into a domestic violence relationship than anyone else. Ms. Dadabo also said that she believed Elena T. was psychologically stable at the close of their relationship because she was able to maintain a job and important relationships in her life, and there was no indication of mental instability. Ms. Dadabo did not agree that Elena T. had a persecutory belief system.

¶ 50    Ms. Dadabo also testified that she had not ever spoken to Alma V. or met any of Elena T.'s children, and she did not have an opinion on the return home goal. It was not Ms. Dadabo's objective to determine if it would be safe for Elena T. to have unsupervised visitation; it was Elena T.'s goal, but not an objective in treatment.

¶ 51    Latoya McCalley, a friend of Elena T.'s, testified that she had known Elena T. for approximately eight years and had personally observed her interact with the minors. Ms. McCalley said Elena T. was "very caring. Everything she does revolves around the children," and said that the children also loved being around her. Ms. McCalley described Elena T. as a great parent and person. Ms. McCalley explained that her daughter was Elena T.'s stepdaughter and Elena T. was like a second mother to her. It was Ms. McCalley's belief that it was in the minors' best interest to return home to live with Elena T. Ms. McCalley explained that although she had not personally spoken to the minors in the last year, she said she saw "via text that the daughter communicated with the mom and said that she wanted to be home," and heard from another minor that he wanted to be home with his mother while Ms. McCalley's own daughter was video-chatting with him.

¶ 52    Elena T. testified on her own behalf that she was currently living alone in a four-bedroom, three-bathroom house that she inherited from her godmother. She inherited a few other properties

from her godmother that she was either going to sell or rent out and manage. Elena T. was in the process of purchasing, with her uncle and his wife, a two-flat with a storefront for her catering business. Elena T. testified that in addition to her catering business, she was going to start working as a security guard again for approximately 25 to 30 hours per week (but with no night shifts), she had a business where she helped people repair their credit, and she still occasionally braided hair for money.

¶ 53     Elena T. testified that she currently volunteered with the Westside Health Authority as an Austin community organizer passing out food and signing people up for resources, employment, and programs; and she also worked with the Shriver Center as a parent table advocate for child welfare. Westside had recently offered Elena T. a job as a permanent organizer, but she had not decided whether to take it.

¶ 54     Elena T. acknowledged that she had a history of receiving mental health services but at the time of the hearing was not seeing a therapist or a psychiatrist. Elena T. said she had not taken medication since the beginning of 2019. She explained that she had started going to the gym and she was able to express herself at the Westside Health Authority meetings with other parents and other people going through experiences similar to hers, both of which helped her keep her anxiety down. Her primary care doctor told her to try staying off the medicine and advised her to keep doing what she was doing.

¶ 55     Elena T. testified that in her current situation she was able to provide for her children's physical safety, including food, shelter, health, and clothing. The minors' cultural and religious background was Moorish American Muslim. The minors' community ties, church, school, and friends would not be affected if they returned home. Elena T. said she lived approximately three or four minutes away from Alma V., so the minors would be able to retain their relationships with

14

Alma V. if they returned home. Elena T. understood that her children had grown to have a strong relationship with Alma V. and explained that she was not trying to "snatch them away." "I just want us to work together to continue raising them together," she told the judge. "I want the opportunity to continue raising my children."

¶ 56    Elena T. then described her relationship with each minor. Elena T. said that when she saw K.G. recently on K.G.'s birthday, K.G. "was really excited. She was really loving. She was allowing me to be loving." Elena T. said it would be worth disrupting K.G.'s life to have her come home to live because Elena T. was the best version of herself, was taking accountability for all of her actions, and was able to address past issues. Elena T. acknowledged that K.G. always said she did not want to return home, but maintained it was in K.G.'s best interest to return home because K.G. reminded Elena T. of herself when she was younger, and she knew she could help guide K.G.

¶ 57    Elena T. also testified about each of the younger minors. She testified that some of them had told her that they wanted to return home to her but did not want to disappoint K.G. or have Alma V. mad at them. She was able to tell the court how she interacted with each of them and what they needed and how she felt she could meet their needs.

¶ 58    Elena T. also testified about risks she thought existed for her children if they stayed with Alma V., which she described as "environmental":

"[B]eing able to have relationships with other people that can be a better—a good influence, not saying a better influence, but a great influence in their life. It's some issues that, like I said, haven't been addressed in my family.

You know, people that have not addressed their mental illnesses, their drug addiction, sexual abuse, things like that, that has been going on in the family. So that's the only risk that I see."

15

¶ 59 Elena T. also explained that her uncles, who were around her children, were gang-affiliated and she did not want that for her daughters or her son, "without a father right now, to look up to no male image in that way to where you have to have a negative impact or intimidating power." Elena T. testified that she wants to be able to talk to the minors, and in particular her daughters, because they are dealing with cultural confusion: "I want them to be secure about who they are, the color of their skin, their hair" and to "let them know, 'No, you're different. It's not because you're this, and you're that."

¶ 60 Elena T. also said:

> "I know it's still a lot that I have to do with all of them to make—to reassure that they can trust me, and everything that has happened, you know, won't happen again. It's a big trust factor there. So I'm not expecting my kids to just, you know. But I just want that chance to actually be able to feel that and for them to feel it as well."

¶ 61                                    D. The Court's Ruling

¶ 62 In its ruling, the circuit court again noted that it had read and considered all of the exhibits admitted, the CCJCC report, and all of the evidence adduced at the hearing. The court also noted that the case had been open for five years and that the minors had resided with Alma V. that whole time. The court explained:

> "I considered all the best interest factors contained in the statute. For me the overriding thing is the fact that the case has been open so long. The children have been in the system for such a long time. And if I were to enter a goal of return home 12 months today, it's not as though the children would return to the mother today. The goal would be entered, but the children wouldn't return home to her today.
>
>            ***

So even if I were to set the goal of return home in 12 months, reality is the case would remain open, and we would be asking the mother to complete these additional services as pointed out by the CCJCC. I think it's commendable what the mother is doing with her life. I think she's headed in the right direction.

But I can't just find that it's in the children's best interest any longer to keep this case open, keep these children in the system. The fact of the matter is, unlike a lot of cases, in this case, there are family members involved. And Ms. Alma [V.] is in the mother's family. And I'm hopeful that they're going to be able to have a relationship and such.

It's in the best interest of the children that they have one so that the children could continue to have a relationship with their mother. I know that there's no question that the children want to have a relationship with the mom and that they love her. But that doesn't mean that they necessarily want to return home to her or that it's in their best interest to return home to her.

So I've considered all the evidence. And, again, as I pointed out, I think the mother has made great strides in terms of personal life and in terms of getting her financial situation together. Those are all great things. But ultimately, at the end of the day, given the length of time that the case has been open, I find that it is in the children's best interest to grant the motion, respectfully, over the mother objection, for private guardianship. I find that it's in the best interest of all six children that Alma [V.] be appointed a[s] the private guardian of all children."

¶ 63    The circuit court granted the DCFS motion, vacated DCFS guardianship, and appointed Alma V. as the minors' private guardian. The court then closed the minors' cases.

¶ 64    This appeal followed.

¶ 65                                      II. JURISDICTION

¶ 66    The orders granting the DCFS motion and closing the case to private guardianship were entered on September 28, 2020, and Elena T. timely filed her notice of appeal on October 15, 2020. We have jurisdiction pursuant to Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. July 1, 2017), governing appeals from final judgments entered by the circuit court in civil cases.

¶ 67                                      III. ANALYSIS

¶ 68    To close this case and place the minors in private guardianship, the court was required to find, by a preponderance of the evidence, that this result was in the minors' best interest. *In re D.T.*, 212 Ill. 2d 347, 366 (2004). Such a finding by the circuit court will not be disturbed unless it is against the manifest weight of the evidence. *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009). A finding is against the manifest weight of the evidence where the opposite conclusion is clearly evident. *In re M.I. v. J.B.*, 2016 IL 120232, ¶ 21. There is a strong presumption in favor of the result reached by the circuit court in child custody cases. *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 20; *In re S.K.B.*, 2015 IL App (1st) 151249, ¶ 28.

¶ 69    Elena T. had not sought, nor does she suggest on appeal that she was ready to seek the immediate return of the minors to her care. Thus, the court's options at the close of the hearing on September 28, 2020, were to close the case and place the children in private guardianship with their great-aunt, in the home where they had thrived for over five years, or to leave them in foster care in the hopes that they could be returned to their mother at some point in the future. While it is apparent that Elena T. has successfully completed a number of services and is committed to having a positive relationship with all of her children, after considering all of the evidence presented, we cannot say that the circuit court's conclusion was against the manifest weight of that

evidence.

¶ 70    The Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2018)) defines a "best interest"

determination as including consideration of the following factors:

"(a) the physical safety and welfare of the child, including food, shelter, health,

and clothing;

(b) the development of the child's identity;

(c) the child's background and ties, including familial, cultural, and religious;

(d) the child's sense of attachments, including:

(i) where the child actually feels love, attachment, and a sense of being

valued (as opposed to where adults believe the child should feel such love,

attachment, and a sense of being valued);

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability

and continuity of relationships with parent figures and with siblings and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child." 705 ILCS

405/1-3 (West 2018).

¶ 71    Another factor that courts have recognized can be significant is the nature and length of the child's relationship to the present foster parent. See *Tajannah O.*, 2014 IL App (1st) 133119 ¶¶ 19-29; *In re Angela D.*, 2012 IL App (1st) 112887, ¶¶ 37-39. In some cases, it is also important that the foster parent is willing to allow continued contact between the child and the biological parents. *Angela D.*, ¶ 41.

¶ 72    Although the circuit court's ruling did not discuss each of the best interest factors separately, the court's explanation for granting the motion makes clear that it properly considered and carefully balanced the statutory and other factors. Although the six minors varied somewhat in their feelings about their mother, they all were comfortable with and felt cared for by their great-aunt. The circuit court had presided over this case for over five years. The circuit court judge spoke to all of the children by Zoom shortly before the hearing. The minors were all doing extremely well in their great-aunt's home, with the school-age children all on the honor roll. Most significantly, all six minors had been living with Alma V. since mid-2015, well over five years, and essentially since the case first came before the court. When the guardianship order was entered, the youngest three minors, Dame., Co., and A.B., had spent more than half of their lives in Alma V.'s care. These facts demonstrate that the minors' sense of attachment, their wishes, and their need for permanence all militated in favor of granting the DCFS motion.

¶ 73    In addition, a clearly relevant consideration in this case was that the foster mother had agreed that Elena T. could and should have an ongoing relationship with her children and be involved in their lives going forward. According to the caseworker, Alma V. had also declined to adopt the children because she understood the children needed and wanted to have a continued relationship with Elena T.

¶ 74    Elena T. argues that she could have met many of her children's needs. She is right that, as

20

to some of the statutory factors, both Elena T. and Alma V. were able to provide things that would have been in the minors' best interest to have. For example, as Elena T. points out, by the time of the hearing, she was in a position to provide food and shelter for her children and to recognize and relate to them as individuals. However, the minors' great-aunt was also able to meet these basic needs. And, importantly, the court was not choosing between returning the minors immediately to their mother's home and placing them in guardianship. Rather, it was choosing between closing the case to guardianship and keeping it open in the hopes that some time in the not too distant future Elena T. would seek and the court would be justified in granting a return home motion. Under these circumstances, Elena T.'s ability to have met some but not all of her children's present needs does not render the circuit court's choice between these two options contrary to the manifest weight of the evidence.

¶ 75    Elena T. argues that Alma V. was raising the children as Catholic while she, their mother, was Moorish American Muslim, which is how she had been raising them prior to DCFS involvement. As she notes, the Juvenile Court Act gives the parent the right to determine the minors' religious affiliation. 705 ILCS 405/1-3(13) (West 2018). While this may be a concern, it does not rise to the level of supporting an argument that the circuit court's finding was against the manifest weight of the evidence. Moreover, at the hearing, Elena T.'s attorney specifically asked in closing that the court not consider the religious preference issue in making its decision.

¶ 76    Elena T. claims that some of the children wanted to return home to her. The evidence to support this claim is her own testimony about what she said some of the children told her, a 2018 Catholic Charities report regarding D.B., and testimony from Ms. McCalley about the contents of a text she had seen and a conversation she had overheard. On the other hand, the caseworker testified that the minors wanted to remain with Alma V., and the court interviewed all of the

children, off the record, regarding their wishes. In addition, there was testimony from the caseworker and in the CCJCC report that all of the children wished to stay together and it is undisputed that K.G., the oldest, wished to remain with Alma V. Thus, it was certainly not against the manifest weight of the evidence for the court to conclude that this factor weighed in favor of guardianship.

¶ 77    Elena T. points out that, to the extent the CCJCC report was concerned about domestic violence, there was ample evidence that she was no longer at an increased risk of being in such a relationship. However, this concern noted in the CCJCC report was not the focus of the hearing on the DCFS motion and it does not appear to have played any role in the circuit court's ruling.

¶ 78                                IV. CONCLUSION

¶ 79    We again commend Elena T. for her hard work, her many successes, and her continued commitment to her children. We appreciate that Alma V. has committed to the agency and to the court that she will allow Elena T. to remain part of her children's lives going forward. Because the circuit court's finding that it was in the best interest of the minors to close the case and place them in private guardianship with their great-aunt was not against the manifest weight of the evidence, we affirm.

¶ 80    Affirmed.