NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (4th) 231484-U

NOS. 4-23-1484, 4-23-1486 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 30, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* J.B. and S.B., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Sangamon County |
| Petitioner-Appellee, | ) | Nos. 20JA302 |
| v. | ) | 20JA303 |
| Jamie B., | ) | |
| Respondent-Appellant). | ) | Honorable |
| | ) | Karen S. Tharp, |
| | ) | Judge Presiding. |

JUSTICE KNECHT delivered the judgment of the court.
Justices Zenoff and Doherty concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed, concluding the trial court's findings respondent was an unfit parent and it was in the minors' best interest to terminate her parental rights were not against the manifest weight of the evidence.

¶ 2    The State filed petitions to terminate the parental rights of respondent, Jamie B., to her minor children, J.B. (born February 2012) and S.B. (born January 2014). The trial court found respondent unfit and determined it was in the minors' best interest to terminate her parental rights. Respondent argues the court's unfitness and best interest determinations were against the manifest weight of the evidence. We affirm.

¶ 3                                      I. BACKGROUND

¶ 4    In October 2020, the State filed petitions seeking to adjudicate the minors neglected under the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq.*

(West 2020)). The State alleged the minors were neglected due to not receiving the proper care necessary for their well-being as their father, Sam B., was arrested for sexually abusing an unrelated minor and respondent intended to allow him back into the home with her and the minors (*id.* § 2-3(1)(a)). (We note Sam's parental rights are not at issue in this appeal.) The State also alleged the minors' environment was injurious to their welfare due to (1) their parents' drug use, (2) their parents' domestic violence issues, and (3) respondent's mental disabilities (*id.* § 2-3(1)(b)).

¶ 5        In January 2021, the trial court entered an adjudicatory order finding the minors neglected. In February 2021, the court entered a dispositional order finding respondent unfit, unable, or unwilling for reasons other than financial circumstances alone to care for the minors, made them wards of the court, and placed their custody and guardianship with the Illinois Department of Children and Family Services (DCFS).

¶ 6        In March 2023, the State filed its initial petition to terminate respondent's parental rights. In June 2023, the State filed its supplemental petition. The supplemental petition alleged respondent was an unfit parent because she failed to (1) maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare (750 ILCS 50/1(D)(b) (West 2022)); (2) make reasonable efforts to correct the conditions forming the basis for the removal of the minors within three nine-month periods following adjudication of neglect, namely (i) from January 14, 2021, to October 14, 2021, (ii) from October 14, 2021, to July 14, 2022, and (iii) from July 14, 2022, to April 14, 2023 (*id.* § 1(D)(m)(i)); and (3) make reasonable progress toward the minors' return during each of these periods (*id.* § 1(D)(m)(ii)).

¶ 7                              A. Fitness Hearing

¶ 8        The fitness hearing was held over two days in December 2023.

¶ 9                                    1. *The State's Evidence*

¶ 10                                        a. Tawnya Hackler

¶ 11        Tawnya Hackler was the caseworker from November 2, 2020, to August 21, 2021. Respondent was required to engage in domestic violence and mental health services, as well as to undergo a substance abuse assessment and engage in any recommended treatment. Respondent provided random drug drops in April, May, and July 2021, but two of those drops were deemed "adulterated," possibly due to drinking a lot of water to dilute the samples. Hackler could not recall respondent missing any visits with the minors or any concerns with the visits. However, there was never a time when Hackler was close to returning the minors to respondent. Hackler was concerned with the safety of returning the minors because a report was made of respondent allegedly engaging in sexual conduct together with Sam and the unrelated minor he allegedly sexually abused.

¶ 12        On cross-examination, Hackler acknowledged respondent did everything asked of her and "was making honest efforts" in doing so. However, respondent had not completed her services during this time, and "[s]ervices [would] need to be completed for the [minors] to return home." Hackler also testified respondent "would need a great deal of support to be able to parent [the minors] by herself" due to her mental health issues. Hackler stated respondent "needs years of therapy to enable her to do something as daunting as raising children on her own."

¶ 13                                        b. Pandora Grey

¶ 14        Pandora Grey was Hackler's supervisor between November 2, 2020, and August 31, 2021. Grey testified, "[t]he main concern was about how [respondent] would protect the [minors] if [Sam] re-entered the picture. Would she be willing and able to protect them? And that was based on her self-disclosed continued communication with [him] while he was in the

Sangamon County Jail." Respondent's visits with the minors were never unsupervised. Grey was never in a position where she could return the minors to respondent.

¶ 15                              c. Kelly Johnston

¶ 16          Kelly Johnston had been the caseworker since April 15, 2022. Johnston testified respondent completed both domestic violence and mental health services. Respondent was required to engage in substance abuse treatment due to being arrested for driving under the influence in November 2021. Respondent completed treatment and attended Alcoholics Anonymous meetings. Respondent provided random drug drops, but "[a]ll of them" came back "adulterated." (According to respondent, this was because she drank a lot of water.) Respondent underwent a psychological evaluation in October 2022 and was diagnosed with generalized anxiety disorder, alcohol use disorder, schizoaffective disorder, and a dependent personality disorder. The last of these was manifested by respondent "continu[ing] to engage in the relationship with [Sam] due to being very dependent on him," so much so that Johnston felt respondent "solely relies on [him] to tell her what decisions she needs to be making."

¶ 17          Respondent attended all her visits with the minors. Respondent requested unsupervised visits. However, Johnston had concerns about Sam's presence after respondent bailed Sam out of jail. Johnston did an unannounced visit at respondent's home and respondent disclosed Sam was there. DCFS made a "critical decision" to reduce her visits from twice a week for three hours to once a week for two hours.

¶ 18          On cross-examination, Johnston acknowledged respondent made efforts and progress in her services. Johnston explained respondent and Sam residing together after she bailed him out, and not the mere fact she bailed him out, was the reason the agency recommended a goal change. Nevertheless, "[b]efore [Sam] was bailed out we were looking at

- 4 -

the children being returned home." Johnston told respondent if she bailed Sam out, it was "not likely" the minors would be returned to her. When Johnston asked her "what would happen" if "we return the [minors] home and [Sam] does something" to them, respondent's answer was "I would hate him." While respondent eventually completed all her services, the "continued concern" for Johnston was "she bailed out [Sam] and it pose[d] a risk for the inability to protect."

¶ 19                                    2. *Respondent's Evidence*

¶ 20          Respondent testified she continued to engage in counseling and to take medication for schizophrenia. Respondent had been sober for two years. When asked why she bailed Sam out of jail, respondent replied he was not getting appropriate medical care and she was worried he was going to die. Respondent filed for an order of protection but did not follow through with it because she "was afraid [she] was giving an incorrect date." Respondent also filed a divorce case but did not follow through with it, both because it would be "going against [her] vows" and because she "wasn't going to divorce [her] best friend." Respondent and Sam were still living together and were "a team." Respondent denied knowing Sam had been charged with eight counts of aggravated criminal sexual abuse and one count of indecent solicitation of a child stemming from the sexual abuse of a 12-year-old girl. Respondent testified Sam would not be allowed to live in the home with her, her father, and the minors if they were returned to her.

¶ 21                                    3. *The Trial Court's Ruling*

¶ 22          The trial court found respondent unfit for failing to maintain a reasonable degree of responsibility as to the minors' welfare, explicitly acknowledging she remained interested and concerned. The court also found respondent unfit for failing to make reasonable progress toward the return of the minors between January 14, 2021, and October 14, 2021, and failing to make

both reasonable efforts to correct the conditions resulting in the removal of the minors and reasonable progress toward their return between July 14, 2022, and April 14, 2023.

¶ 23    In finding respondent unfit, the trial court stated:

"I've heard much about will she protect the children? Valid question. Not just would she protect the children from potentially if [Sam] is convicted, if he really did have sex with a child, would she protect her children from Sam's potential sexual activity.

*** Would she protect herself? Clearly not. She didn't follow through with the [order of protection]. Would she protect her children in that situation? It becomes clear that she would not.

* * *

*** Has she done services? Yes. Has she made progress? Part of progress is looking to see whether or not they have complied with the directives on a service plan or addressed other issues that have come to light throughout the case. But really, the determination on whether or not someone has made progress is [whether] the progress [is] of such a nature, of such a quality, that the Court could in the near future place a child or children back in a parent's care. *** Her progress is not of such a quality that I could be able to say, 'I am close to being able to place these children in her care in the near future.' "

¶ 24                    B. Best Interest Hearing

¶ 25                        1. *The State's Evidence*

¶ 26        Kelly Johnston testified the minors have been living in a licensed foster home with their foster mother, Kristy G., her husband, and their biological children since October 2020. The minors "get along really well" with their foster parents and their biological children. The minors have been doing "really well" in their foster home and have not expressed any concerns about being there. The minors see a doctor regularly, do well in school, and participate in extracurricular activities. S.B. was diagnosed with attention deficit hyperactivity disorder and had begun taking medication for it. Johnston observed a bond between the minors and foster parents during her monthly visits and believed this home served the minors' best interest. The minors "really like the placement and they have told [Johnston] that they want to stay there," and the foster parents wanted to adopt them. Johnston believed it was in the minors' best interest for respondent's parental rights to be terminated.

¶ 27                        2. *Respondent's Evidence*

¶ 28                        a. Respondent's Father

¶ 29        Respondent's father, Michael G., testified respondent has a "good, loving relationship" with the minors. There was a visit between him, respondent, and the minors the previous evening, where they had dinner and exchanged Christmas presents. The minors were "happy" to see respondent and had "lots of smiles." Michael testified the minors are "always happy" and "excited" to see respondent at visits. Michael felt it would be detrimental to the minors if respondent's parental rights were terminated because of the "close bond" they have with each other. Michael and respondent were financially capable of providing for the minors, and there was adequate space in his home for them.

¶ 30                        b. Respondent

¶ 31 Respondent testified termination of her parental rights would not be in the minors' best interest. According to respondent, at the end of a recent visit, the minors "said they wished that they could come home." Respondent was willing to continue in services to demonstrate to the trial court she was making efforts and progress toward the minors' return and said Sam would not be allowed to live with her and the minors.

¶ 32 3. *The Trial Court's Ruling*

¶ 33 The trial court explained it was "considering all the best interest factors" and noted the minors had been in their foster home for three years, were being cared for there, and wanted to stay there. The court stated:

> "Also, very troubling to the Court is that [respondent] says, 'If the kids come home, Sam won't be around.' But, that tells me nothing about her ability to protect herself. The fact that she only sees this as being an issue of Sam can't be around the children, I still don't think she understands why this case was adjudicated. The impact that Sam has on her, and I still don't think she gets that."

¶ 34 The trial court found "giving [respondent] more time would [not] make a difference. It would take too long. These children need permanence before that could ever happen, if it would ever happen." The court concluded it was in the minors' best interest to terminate respondent's parental rights.

¶ 35 This appeal followed.

¶ 36 II. ANALYSIS

¶ 37 The Juvenile Court Act provides a two-step process for involuntary termination of parental rights. 705 ILCS 405/2-29(2) (West 2022). First, the State must prove by clear and

convincing evidence the parent is an "unfit person," as defined by section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022)). *In re Gwynne P.*, 215 Ill. 2d 340, 354, 830 N.E.2d 508, 516 (2005). Second, if the trial court finds a parent unfit, the State must establish by a preponderance of the evidence termination of parental rights is in the minor's best interest. *In re D.T.*, 212 Ill. 2d 347, 353, 818 N.E.2d 1214, 1220-21 (2004).

¶ 38                           A. Unfitness Finding

¶ 39            Respondent argues the trial court's finding of unfitness was against the manifest weight of the evidence.

¶ 40            The trial court found respondent unfit because she failed to (1) maintain a reasonable degree of responsibility as to the minors' welfare (750 ILCS 50/1(D)(b) (West 2022)); (2) make reasonable progress toward the return of the minors during the nine-month period of January 14, 2021, to October 14, 2021 (*id.* § 1(D)(m)(ii)); and (3) make reasonable efforts to correct the conditions which resulted in the removal of the minors or to make reasonable progress toward their return during the nine-month period of July 14, 2022, to April 14, 2023 (*id.* § 1(D)(m)(i), (ii)). "A parent's rights may be terminated if even a single alleged ground for unfitness is supported by clear and convincing evidence." *Gwynne P.*, 215 Ill. 2d at 349.

¶ 41            Section 1(D)(m)(ii) of the Adoption Act provides a parent may be found unfit if she fails "to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication" of neglect. 750 ILCS 50/1(D)(m)(ii) (West 2022).

> " 'Reasonable progress' is an objective standard which exists when the trial
> court, based on the evidence before it, can conclude that the progress being
> made by a parent to comply with directives given for the return of the child

is sufficiently demonstrable and of such a quality that the court, in the *near future*, will be able to order the child returned to parental custody. The court will be able to order the child returned to parental custody in the near future because, at that point, the parent *will have fully complied* with the directives previously given to the parent in order to regain custody of the child." (Emphases in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461, 577 N.E.2d 1375, 1387 (1991).

¶ 42    A trial court's finding a parent is unfit will not be reversed unless it is against the manifest weight of the evidence. *In re N.G.*, 2018 IL 121939, ¶ 29, 115 N.E.3d 102. A decision is against the manifest weight of the evidence only when the opposite conclusion is clearly evident.

¶ 43    Between July 14, 2022, and April 14, 2023, respondent completed mental health and domestic violence services. Respondent also completed substance abuse treatment and attended Alcoholics Anonymous meetings, though all her drug drops were "adulterated." While respondent attended all her visits with the minors, she never progressed to unsupervised visits. After respondent requested unsupervised visits, and even after engaging in mental health and domestic violence services, she bailed Sam, who was charged with sexually abusing an unrelated minor, out of jail, and they resumed living together. Johnston testified regarding her concern over respondent being able to protect the minors if Sam was back in the home. In fact, Sam was in the home during one of the unannounced visits. When asked what would happen if the minors were returned to her and Sam abused them, respondent merely said she "would hate him."

¶ 44    This court has observed "there [is] a significant difference between going through the motions, checking off the boxes, and mechanically doing what is asked of the parent and

actually changing the circumstances that brought the children into care." *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 56, 187 N.E.3d 763. "The point of requiring parents to attend classes and engage in services *** is so parents *apply* what they learn *** such that the court can be confident that the children will be safe in their care." (Emphasis in original.) *Id.* Here, despite engagement in and completion of services, respondent, through bailing Sam out of jail and resuming living together despite him being charged with sexually abusing a child, was not able to apply the skills learned to justify the trial court's confidence of the minors being safe in her care. *Id.* It is not clearly evident respondent made sufficiently demonstrable progress toward the minors' return during this period. Accordingly, the court's finding respondent was unfit for failure to make reasonable progress was not against the manifest weight of the evidence.

¶ 45                              B. Best Interest Determination

¶ 46        Respondent also argues the trial court's best interest determination was against the manifest weight of the evidence.

¶ 47        Following a finding of unfitness, the parent's interest in maintaining a parent-child relationship must yield to the best interest of the child. *D.T.*, 212 Ill. 2d at 364. At the best interest hearing, the State bears the burden of proving by a preponderance of the evidence termination of parental rights is in the child's best interest. *Id.* at 366. In making its finding, the trial court considers the factors set forth in section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2022)). The statutory factors include: (1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties, including familial, cultural, and religious; (4) the child's sense of attachments, including where the child feels love, security, and familiarity; (5) the child's wishes; (6) the child's community ties, including church, school, and friends; (7) the child's need for permanence, including the

need for stability and continuity of relationships with parental figures and siblings; and (8) the uniqueness of every family and child. *Id.*

¶ 48 "A court may also consider the nature and length of the child's relationship with his present caretaker and the effect that a change in placement would have upon his emotional and psychological well-being." *In re Tiffany M.*, 353 Ill. App. 3d 883, 893, 819 N.E.2d 813, 822 (2004). "The court's best interest determination [need not] contain an explicit reference to each of these factors, and a reviewing court need not rely on any basis used by the trial court below in affirming its decision." *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19, 8 N.E.3d 1258. On review, "[w]e will not disturb a court's finding that termination is in the child[ ]'s best interest unless it was against the manifest weight of the evidence." *In re T.A.*, 359 Ill. App. 3d 953, 961, 835 N.E.2d 908, 914 (2005). "A finding is against the manifest weight of the evidence only if the evidence clearly calls for the opposite finding [citation], such that no reasonable person could arrive at the circuit court's finding on the basis of the evidence in the record [citation]." (Internal quotation marks omitted.) *In re J.H.*, 2020 IL App (4th) 200150, ¶ 68, 162 N.E.3d 454.

¶ 49 Here, the evidence established the minors had been residing and getting along with their foster family since October 2020. The minors' foster parents were providing for their medical and educational needs, they were all bonded with one another, the minors liked living there and wanted to stay, and the foster parents wanted to adopt them. Respondent's father testified about the loving and bonded relationship respondent and the minors have. However, while a genuine bond of love between the minors and respondent may exist, "[f]ollowing a finding of unfitness *** the focus shifts to the child. The issue is no longer whether parental rights *can* be terminated; the issue is whether, in light of the child's needs, parental rights *should* be terminated." (Emphases in original.) *D.T.*, 212 Ill. 2d at 364. The law is clear the existence of

- 12 -

a parent-child bond "does not automatically insure that *** the child's best interests will be served by that parent." *In re J.B.*, 198 Ill. App. 3d 495, 499, 555 N.E.2d 1198, 1201 (1990).

¶ 50　　　　　The record does not clearly demonstrate the trial court should have reached the opposite result. Accordingly, the court's best interest determination was not against the manifest weight of the evidence.

¶ 51　　　　　　　　　　　　　III. CONCLUSION

¶ 52　　　　　For the reasons stated, we affirm the trial court's judgment.

¶ 53　　　　　Affirmed.